UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| JOHN B. H., | 4:20-CV-04080-VLD |
| Plaintiff, | |
| vs. | MEMORANDUM OPINION AND ORDER |
| ANDREW M. SAUL, Commissioner of the Social Security Administration, | |
| Defendant. | |

**INTRODUCTION**

Plaintiff, John B. H., seeks judicial review of the Commissioner's final

decision denying his application for social security disability and supplemental

security income disability benefits under Title II and Title XVI of the Social

Security Act.[1]  Mr. H. has filed a complaint and motion to reverse the

---

[1]SSI benefits are called "Title XVI" benefits, and SSD/DIB benefits are called "Title II" benefits. Receipt of both forms of benefits is dependent upon whether the claimant is disabled.   The definition of disability is the same under both Titles.  The difference—greatly simplified—is that a claimant's entitlement to SSD/DIB benefits is dependent upon one's "coverage" status (calculated according to one's earning history), and the amount of benefits are likewise calculated according to a formula using the claimant's earning history.  There are no such "coverage" requirements for SSI benefits, but the potential amount of SSI benefits is uniform and set by statute, dependent upon the claimant's financial situation, and reduced by the claimant's earnings, if any.  There are corresponding and usually identical regulations for each type of benefit.  See, e.g., 20 C.F.R. §§ 404.1520 and 416.920 (evaluation of disability using the five-step procedure under Title II and Title XVI).  Mr. H. filed his application for both types of benefits.  T11, 213.  His coverage status for SSD benefits expires on June 30, 2021.  T12.  In other words, in order to be entitled to Title II benefits, Mr. H. must prove disability on or before that date.

Commissioner's final decision denying him disability benefits and to remand the matter to the Social Security Administration for further proceedings.  See Docket Nos. 1, 16.  The Commissioner has filed his own motion seeking affirmance of the decision at the agency level.  See Docket No. 18.

This appeal of the Commissioner's final decision denying benefits is properly before the court pursuant to 42 U.S.C. § 405(g).  The parties have consented to this magistrate judge handling this matter pursuant to 28 U.S.C. § 636(c).

**FACTS**[2]

**A.    Statement of the Case**

This action arises from Mr. H.'s application for Social Security Disability Benefits ("SSDI") and Supplemental Security Income ("SSI") with a protected filing date of August 29, 2017, alleging disability starting August 17, 2015, due to a back condition, anxiety, depression, chronic pain, loss of smell, loss of taste, headaches, and a head injury.  T212, 227, 263.[3]

Mr. H.'s claims were denied at the initial and reconsideration levels, and Mr. H. requested an administrative hearing.  T113, 121, 128, 139, 141, 144.

Mr. H.'s administrative law judge ("ALJ") hearing was held on March 13, 2019, and Mr. H. was represented by different counsel than his attorney in this appeal.  T42.  An unfavorable decision was issued on May 1, 2019.  T8-27.

_____

[2] These facts are recited from the parties' stipulated statement of facts (Docket No. 15).  The court has made only minor grammatical and stylistic changes.

[3] Citations to the appeal record will be cited as "T" followed by the relevant page or pages.

At step one of the evaluation, the ALJ found that Mr. H. had not engaged in substantial gainful activity since August 17, 2015, the alleged onset of disability date.  T14.

At step two, the ALJ found that Mr. H. had severe impairments, including a history of closed head injury with skull fracture; T12 burst fracture; lumbar degenerative disc disease with L4-5 disc herniation with mild stenosis; and right lateral femoral cutaneous nerve syndrome.  T14.  The ALJ found that each of those impairments significantly limited Mr. H.'s ability to perform basic work activities.  T14.

The ALJ also found that Mr. H. had medically determinable impairments of depressive disorder and anxiety disorder that caused no more than minimal impacts on his ability to perform basic work activities and were therefore non-severe.  T14.  The ALJ found that Mr. H. had mild limitations due to these mental impairments in his ability to understand, remember, and apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage himself.  T14-15.  The ALJ stated that these limitations identified in the "paragraph B" criteria were not a residual functional capacity ("RFC") assessment and that a mental capacity assessment would require a more detailed assessment.  T15.

In step three, the ALJ found that Mr. H. did not have an impairment that meets or medically equals a listing.  T15-16.  The ALJ's decision addressed only listings 1.04 and 11.14 specifically.  T15-16.

The ALJ determined that Mr. H. had RFC to:

> perform less than a full range of light work . . . .  He can lift
> and/or carry 20 pounds occasionally, 10 pounds frequently.
> He can stand or walk for 2 hours of an 8-hour workday and
> would need the use of a cane.  He can sit for 6 hours of an 8-
> hour workday.  He can occasionally climb ramps and stairs,
> ladders, ropes or scaffolds. He can occasionally stoop,
> frequently kneel, occasionally crouch and occasionally crawl.
> He cannot have exposure to extreme cold.  He needs to
> change position, such that he would need an option to
> alternate to sitting for less than 5 minutes after every 15
> minutes of standing or walking.  He can remain on task
> while sitting.  He would need an option to alternate to
> standing for less than 5 minutes after every 30 minutes of
> sitting.  He can remain on task while standing.

T16.

The ALJ found that Mr. H.'s impairments could reasonably be expected
to cause the symptoms alleged by Mr. H.; however, his statements concerning
the intensity, persistence, and limiting effects of those symptoms were "not
entirely consistent with the medical evidence and other evidence in the record
for the reasons explained in this decision."  T17.

The ALJ found at step four that Mr. H. could not perform his past
relevant work as a final inspector, construction worker, and product
assembler.  T19-20.

The ALJ found at step five, relying on the testimony of a vocational expert
("VE"), that Mr. H. could perform the occupations of electronics worker,
DOT# 726.687-010; circuit board assembler, DOT# 726.687-038; and wafer
cleaner, DOT# 590.685-062, relying on the number of jobs available in the
national economy for each occupation.  T21.

4

The ALJ considered the opinions of the State agency medical consultants and stated they were "somewhat persuasive" and that the ALJ agreed with their assessments regarding Mr. H.'s ability to lift and carry; however, the ALJ added positional changes and limited Mr. H.'s standing and walking due to more recent medical records and Mr. H.'s testimony.  T19.

The ALJ considered the opinions of the State agency psychological consultants and rejected their findings at the initial level, as they determined Mr. H. had no medically determinable impairments.  T70, 81.  But the ALJ found that the State agency opinions at the reconsideration level that Mr. H. had non-severe mental impairments were "very persuasive" because they were consistent with and supported by Mr. H.'s daily activities and mental status examinations.  T19.

The ALJ considered the opinions of Adil K. Shaikh, MD, a physical medicine and rehabilitation treating specialist, who opined that Mr. H.'s chronic back pain limited him to less than a full range of sedentary work, including less than 6 hours sitting, limited reaching, and no ability to climb, balance, stoop, kneel, crouch, or crawl.  T19.  The ALJ found the opinions "not persuasive" because they described a level of dysfunction that was inconsistent with the objective medical evidence and other evidence.  T19.  The ALJ noted that a complete inability to perform postural activities was "so extreme" and inconsistent with Mr. H.'s ability to show up at the hearing and attend appointments, and there was no explanation why reaching increased his back pain or why Mr. H. could not sit for 6 hours.  T19.

5

Mr. H. requested review of the ALJ's denial from the Appeals Council on July 1, 2019 (T199) and submitted a Department of Veterans Affairs "Rating Decision" dated February 2, 2018 (T28-31), to the Appeals Council on December 3, 2019.  T28.

The Appeals Council denied Mr. H.'s request for review on April 23, 2020, but did not mention the Department of Veterans Affairs Rating Decision in the Notice or Order, and thereby made the ALJ's decision final.  T1-5.

Mr. H. timely filed this action.

**B.    Relevant Medical Evidence in Chronological Order:**

Mr. H. was seen at the VA emergency room on August 21, 2015, with a skull fracture and subdural hematoma resulting from a fall off of a scaffolding and was transferred via ambulance to Avera Hospital for trauma/neurosurgery assessment.  T689.  Mr. H. was admitted at Avera Hospital on August 21, 2015, with a closed head injury associated with a significant skull fracture, and a T12 burst fracture resulting from a fall off a scaffolding.  T345.  He reported headaches associated with nausea and vomiting, and significant lower back pain.  T345. The skull fracture and T12 fracture were shown in a CT obtained at the VA Hospital, and in additional scans at Avera.  T345, 353, 356-58.  The head/brain CT revealed a comminuted fracture at the vertex of the skull extending into the frontal and parietal on the right and frontal lobe on the left with some diastase of the sagittal suture.  T491.  Scalp hemorrhage and soft tissue swelling were also demonstrated, and a 4 mm subdural hematoma was seen.  T491. A lumbar CT obtained also revealed a small disc protrusion at

6

L4-5 causing mild thecal sac compression.  T355.  Mr. H. was fitted for a TSLO brace and discharged on August 24, 2015, with prescriptions for Ultram and OxyIR for pain control.  T345-46.  Throughout his hospitalization, Mr. H. would remain neurologically stable and his headaches were generally well controlled.  T345.  Mr. H. was instructed to wear his TSLO brace at all times when upright, not to lift over 10 pounds, and restricted from work until further follow-up appointment in three weeks.  T346.

Mr. H. was referred to Dr. Shaikh at Avera Physical Medicine and Rehabilitation Clinic on December 29, 2015, to follow up on his head and back injuries.  T428.  Mr. H. reported ongoing pain mostly at the location of his fracture at T12 and lower at the L4 level, which was made worse by bending, lifting, carrying, and prolonged standing or sitting.  T428.  The treatment record shows Mr. H. had been working at a motel for about a year, 20-30 hours a week, as a maintena

nce person.  T428.  Examination revealed his range of motion in his back was quite limited, he had significant pain with forward flexion, and palpation caused extreme pain in the T12 area.  T429.  However, Mr. H.'s gait was normal.  T429.  Mr. H.'s straight leg raise, FADIR, FABER, and Open Book and Close Book tests were all negative.  T429.[4]  Mr. H.'s assessments included

_____

[4] The Flexion, Adduction, Internal Rotation ("FADIR") test refers to a clinical examination test performed to assess for hip femoroacetabular impingement. https://radiopaedia.org/articles/fadir-test (last visited: January 4, 2021). The Flexion, Abduction and External Rotation ("FABER") test is a clinical test done to assess for pathology in the pathology of the hip joint or the sacroiliac joint.  https://radiopaedia.org/articles/faber-test?lang=us (last visited: January 4, 2021).  Open Book and Close Book Compression tests are used to

moderate traumatic brain injury with sequelae of bad smells, T12 burst fracture with continued significant severe pain, L4-5 disc herniation with mild stenosis, and right lateral femoral cutaneous nerve syndrome.  AR429.  Dr. Shaikh stated it was quite usual for Mr. H. to have pain four months after his injury, but the amount of pain seemed extreme as he jumped up and screamed when gently touched at the T12 level.  AR429.  A new MRI was ordered, physical therapy ordered, and tramadol prescribed for his pain.  AR429.

Mr. H. was seen at Avera University Physical Therapy for nine therapy sessions during January 2016 for treatment of low back and thoracic pain. T393-98.  Mr. H. reported his pain as constant and not improving with a "stabbing" sensation, and it was aggravated by activity and alleviated by laying down.  T393.  Mr. H. displayed impaired range of motion, mildly decreased strength, impaired posture, and elevated pain.  T394.

A lumbar MRI obtained on January 19, 2016, revealed a subacute healing compression fracture at T12, reactive marrow edema or contusion at the anterior aspect of T11 with slightly increased signal since prior MRI in November 2015, and degenerative disc disease and a small broad-based central disc protrusion at L4-5, which may mildly efface the right L5 nerve root. T363-64.

Mr. H. was seen by Adil K. Shaikh, MD, at Avera Physical Medicine and Rehabilitation Clinic on January 29, 2016, to follow up on his head and back

---

evaluate sacroiliac ("SI") joint dysfunction.
http://mskmedicine.com/clinical_skills/sacroiliac-joint-compression-tests/
(last visited: January 4, 2021).

injuries.  T402.  Mr. H. reported significant ongoing pain that was aggravated by physical therapy.  T403.  He said his pain was in the low back area, sharp and shooting, but not radiating down his legs.  T403.  Mr. H. said he could walk about three blocks, and the pain affected his ability to perform activities of daily living ("ADLs") and his ability to work.  T403. Examination revealed Mr. H. was in moderate distress, range of motion of his back was quite limited, significant pain with forward flexion, and palpation caused extreme pain in the T12 area.  T403.  Mr. H.'s neurovascular assessment was within normal limits and his straight leg raise test was negative.  T403.  Mr. H.'s assessments included moderate traumatic brain injury with loss of smell, T12 burst fracture with continued moderate-to-severe pain, L4-5 disc herniation with mild stenosis centrally, and right lateral femoral cutaneous nerve syndrome.  T403. Mr. H.'s physical therapy was stopped, he was referred to Dr. Baka in Radiology for a vertebroplasty/kyphoplasty, he was restricted to light work for only three hours per day five days per week, and tramadol was continued for pain with a consideration of an upgrade to hydrocodone.  AR403-04.

Mr. H. was seen by Dr. Shaikh at Avera Physical Medicine and Rehabilitation Clinic on March 28, 2016, to follow up on his head and back injuries.  T407.  Mr. H. reported his pain was sharp and dull mostly in the mid back area consistent with T12.  T408.  Mr. H.'s neurological assessment was within normal limits for muscle bulk, tone, reflexes, and sensation, and his straight leg raising continued to be negative.  T408.  In addition, Mr. H.'s assessment showed his right lateral femoral cutaneous nerve syndrome was

9

improving, and he had only mild tingling in bilateral lower extremities.  T409.
Mr. H. said he had "tingling" down both legs the last week when he was laying
down.  T409.  Mr. H. said he could walk about three blocks, and the pain
affected his ability to perform ADLs such as bathing, grooming, and dressing,
and it prevents him from working.  T408.  Mr. H. reported he had difficulty
working as his employer did not comply with work restrictions.  T408.  He had
been referred for a vertebroplasty/kyphoplasty, but his insurance declined the
treatment.  T408.  Examination revealed Mr. H. was in mild-to-moderate
distress, range of motion of his back continued to be limited, significant pain
with forward flexion, and palpation continued to cause pain in the T12 area.
T408.  Mr. H.'s assessments included moderate traumatic brain injury with
loss of smell; T12 burst fracture with continued moderate-to-severe pain, not a
surgical candidate and declined by insurance for vertebroplasty; L4-5 disc
herniation with mild stenosis centrally; right lateral femoral cutaneous nerve
syndrome—improving; and mild tingling in bilateral legs.  T409.  Gabapentin
was added, and a back brace was prescribed for use two hours per day at
most.  T409.

Mr. H. was seen by Dr. Shaikh at Avera Physical Medicine and
Rehabilitation Clinic on June 28, 2016, to follow up on his head and back
injuries.  T412.  Mr. H. reported continued pain that only decreased when he
lays down on the right.  T413.  Oxycodone, Robaxin, Mobicox, and tramadol
had been tried already without much benefit.  T413.  Mr. H. reported the
oxycodone did not help whatsoever, but the gabapentin may have helped a

little.  T413.  Mr. H. said he could walk about three blocks, and the pain affected his ability to work.  T413.  He said he was wearing the back brace at work, which seemed to make it tolerable.  T413.  Examination revealed Mr. H.'s range of motion of his back continued to be limited, he had the most pain with forward flexion, and palpation continued to cause pain in the T12 area.  T414.  Mr. H.'s neurovascular assessment revealed normal muscle bulk, tone, reflex, and sensation with negative straight leg raise.  T414.  Mr. H.'s plan included only medication options, as interventions or surgery were not options, so his gabapentin dosage was increased, oxycodone was changed to hydrocodone, and he was to continue wearing the back brace.  T414.

Mr. H. was seen by Dr. Shaikh at Avera Physical Medicine and Rehabilitation Clinic on September 27, 2016, to follow up on his head and back injuries.  T417.  Mr. H. reported continued pain, he could walk about a block or two, and the pain did not affect his ADLs, but did affect his ability to work.  T418.  Although Mr. H. previously worn a back brace, which seemed to help him, he stopped wearing it.  T418.  Mr. H. reported that his current medications reduced his pain from 7/10 to 3-4/10.  T418.  Mr. H. reported he had lost his job due to his inability to comply with the current work restrictions.  T418.  Examination revealed Mr. H.'s range of motion of his back continued to be limited, he had normal range of motion with forward flexion, but it caused significant pain, and palpation continued to cause significant pain in the T12 area.  T418.  Dr. Shaikh stated that all conservative measures had been tried, but there was no good surgical option.  T419.  Mr. H.'s

11

medications were continued, a new back brace prescribed, and a vertebroplasty was going to be checked again for approval with the insurance company.  T419.

Mr. H. was seen by Dr. Shaikh at Avera Physical Medicine and Rehabilitation Clinic on December 27, 2016, to follow up on his head and back injuries.  T422.  Dr. Shaikh stated that a vertebroplasty was considered to be the ideal treatment for Mr. H., but the insurance company continued to decline the treatment.  T423.  Dr. Shaikh stated that Mr. H. had been sent for an independent medical exam by Dr. Thomas Jetzer, who concluded that Mr. H. was at maximum medical improvement ("MMI"), but that a vertebroplasty was not indicated.  T423.  Dr. Shaikh stated he agreed that Mr. H. was at MMI, but disagreed with the indication for vertebroplasty.  T423.  Mr. H. reported continued pain at 8/10, and he was taking hydrocodone and gabapentin, which seemed to reduce the pain to about 3-1/10 depending on the day.  T423.  Mr. H. also complained of a new headache.  T423.  He had been using his new back brace, which seemed to help quite well.  T423.  Examination revealed that movement or palpation caused Mr. H. to wince, range of motion of his back continued to be limited with very little motion in his lumbar spine, range of motion with forward flexion was restricted, but he had good forward flexion in his upper back and cervical spine, and palpation continued to cause significant pain in the T12 area.  T423.  Mr. H.'s medications were continued, except gabapentin was changed to amitriptyline due to the headache.  T424.

Mr. H. was seen at the VA by his primary care provider on February 21, 2017, to follow up on his mid back pain and nonhealing T12 fracture.  T670.

12

He complained of neck tightness and pain with headache at the location of the skull fracture. T670. Mr. H. reported headache pain of 10/10, but stated it typically was 8/10, and improves with ibuprofen to 5/10. T670. He reported trying hydrocodone, tramadol, and Tylenol #3 without relief. T670. Mr. H. stated he would like to improve his pain and be able to get back to work. T670. Acupuncture, massage, chiropractic treatment, and physical therapy were recommended for his headaches, and a DEXA scan was planned for his back. T669. Mr. H. continued under lifting restrictions of lifting 10 pounds or less. T669.

A brain MRI obtained at the VA due to a history of head trauma with headaches on February 28, 2017, was normal. T487-88.

A bone density study obtained at the VA on March 6, 2017, revealed osteopenia of the left femoral neck and lumbar spine. T483. A thoracic spine MRI obtained the same day revealed several small thoracic disc herniations indenting the thecal sac but without significant stenosis or effect on the cord, chronic mild T3 and T4 endplate compression fractures, and thoracolumbar kyphotic angulation at the T12 compression fracture level. T485. A lumbar spine MRI obtained the same day revealed an unchanged T12 compression fracture, multilevel disc degeneration with a broad-based protrusion mildly compressing the ventral sac at L4-5 producing mild canal stenosis, which narrows the space adjacent to the left L5 nerve but without nerve compression, and mild bilateral foraminal stenosis at that level from disc bulge without nerve root compression. T486.

13

Mr. H. was seen at the VA Physical Therapy Clinic on March 16, 2017, for mid-low back pain with B sciatica. T646. Examination revealed decreased postural awareness, inability to hip hinge, reduced range of motion, reduced flexion, extension, reduced strength on left hip flexion, and positive repeated flexion test for disc protrusion and scour test B for possible labrum tear. T647. Mr. H. reported he was not taking any medication to relieve his pain. T647. Mr. H. declined physical therapy pending neurosurgery consultation. T648.

Mr. H. was referred to Bryan Wellman, MD, at Sanford Neurosurgery and Spine Clinic and was seen on April 4, 2017, for evaluation of low back pain. T438. Mr. H. complained of back pain and posterior leg pain with numbness or tingling in the legs. T438. Dr. Wellman reviewed Mr. H.'s March 6, 2017, MRI, which showed a chronic compression fracture of T12 unchanged, a disk protrusion at L4-5 or possibly L5-S1, transitional vertebrae, and neural foraminal narrowing at L4-5. T439. Examination revealed full strength (5/5) in the bilateral lower extremities limited by pain, positive straight leg elevation ("SLE") bilaterally, and sensory changes in the bilateral lower extremities. T440. Mr. H.'s assessment included T12 compression fracture not fully healed, chronic midline low back pain with bilateral sciatica, and lumbar disc herniation. T440. Epidural steroid injections were administered at L4-5 on April 10, 2017, at Sanford Hospital. T436-37.

Mr. H. contacted the Neurosurgery Clinic on April 13, 2017, and reported that his symptoms had worsened since the epidural injection and that he was seen at the emergency room at the VA on April 12, 2017, due to difficulty

14

ambulating and weakness in his legs.  T437-38, 638 (VA ER Visit).  A CT scan of the lumbar spine was obtained and he was told it was normal.  T437-38. The CT showed the prior compression deformity at T12 without evidence of acute osseous or alignment abnormality.  T481.  Mr. H. said his left leg had given out, and he had worse left low back pain with sharp pain into the left buttock with tingling to the left leg to toes.  T435.

Mr. H. was given axillary crutches at the VA on April 18, 2017, due to left foot drop after receiving an epidural injection.  T526-27, 635.

Lumbar spine MRI was obtained on April 18, 2017, that showed the L5 segment was transitional, disc desiccation and mild disc bulging at L4-5 with very mild narrowing of the left lateral access, and moderate T12 compression fracture.  T441.

Mr. H. was seen at the VA on May 4, 2017, for "Battlefield Acupuncture Protocol" for his mid back pain.  T631.  Semi-permanent needles were placed in all 10 points in both ears.  T632.  Mr. H. tolerated the procedure well without any complications.  T632.  Phone follow up with Mr. H. on May 11, 2017, revealed that all the needles had fallen out and no pain reduction was noted. T633.

Mr. H. was seen in the primary care clinic at the VA on June 15, 2017, to obtain certification that he was unable to participate in a community work program or employment due to a medical condition.  T609-10.  He needed the certification to continue to receive food stamps.  T610.  The certification was

completed due to his inability to work due to back pain with a history of a T12 compression fracture.  T610.

Mr. H. was seen for chiropractic care at the VA on June 30, 2017, for low back pain.  T520.  Mr. H. indicated pain in the T12 and L4 areas that had continued to be severe without improvement, and numbness through his entire left leg and foot.  T521.  Mr. H. stated his pain was worse with prolonged sitting and activity.  T521.  Examination revealed muscle weakness and sensory loss of the left lower extremity, deferred straight leg raise test due to pain, limited range of motion with pain, and muscle pain and tenderness in the thoracic and lumbar spine.  T522-23.  Mr. H. was capable of ambulating without assistance. T522.  Chiropractic treatment was planned with a goal of improving his low back pain enough so he could sleep through the night without being regularly woken up by the pain.  T523-24.  A TENS unit was provided at the VA for Mr. H. on June 30, 2017.  T521, 524, 605.

Mr. H. was seen at the VA on July 17, 2017, for acupuncture and massage treatment for his back and leg pain.  T600-03.

Mr. H. was seen at the VA for chiropractic care on July 18, 2017, and reported no change in his back following the initial treatment.  T599.  He was open to more aggressive treatment to see if it could help him.  T599.

Mr. H. was seen at the VA on July 24, 2017, for acupuncture treatment, aromatherapy, and massage treatment for his back and leg pain.  T595-97.

Mr. H. was seen at the VA emergency room on August 9, 2017, with acute back pain following chiropractic treatment the prior day.  T590.  A CT of

16

the thoracic spine was obtained that revealed chronic T12 compression fracture, exaggerated thoracic kyphosis, and small disc osteophytes at T7-8 and T8-9 with mild central spinal canal narrowing.  T479-80.  Mr. H. was given a Toradol injection, Ultram, Flexeril, and told to continue using the TENS unit. T590.

Mr. H. was seen at the VA on August 14, 2017, for acupuncture treatment for his back and leg pain.  T582-83.

Mr. H. was seen at the VA for chiropractic care on August 14, 2017, and reported a significant flareup in back pain after his last chiropractic treatment, and following a reassessment of his back, his chiropractic treatment was discontinued.  T580-82.

Mr. H. phoned the VA on August 15, 2017, and reported his back and leg pain had not improved, his chiropractor recommended discontinuing treatment, and acupuncture treatment had not helped.  T580.  He also reported saddle numbness and was told to come to the emergency room.  T580.

Mr. H. was seen at the VA emergency room on August 15, 2017, for back pain with radiation to his left leg.  T576.  Mr. H. had been taking Ultram and Flexeril for pain and muscle spasm.  T577.  Examination revealed an inability to stand on both feet due to questionable pain and numbness, and decreased muscle strength in the left leg.  T577.  Mr. H. was given a Toradol injection, Ultram, and prednisone.  T577.  Under the treatment problem list, it stated, "Pt ambulating fine. Gait observed when walking out of the ER to pharmacy looked

fine and a[b]le to walk brisk. Suspect secondary gain to the low back pain."
T578.

Mr. H. had a phone appointment with the VA's interactive health coach
on August 22, 2017, and reported that acupuncture treatment had only been
helpful during the treatment, and massage therapy and chiropractic care did
not decrease his pain at all.  T569.

Mr. H. saw Angela Carruthers, LPC, QMHP for counseling at Community
Counseling Services on August 28, 2017, and his mental status included a
hyperalert level of consciousness, appropriate affect, and depressed mood.
T449.  Mr. H. was having depression related to his work injury and looking for
assistance with applying for disability.  T449.  He reported worrying all day
about things he cannot control, finding it difficult to distract himself due to not
being able to get up and move around, and that he was an active person before
and was finding "having to do nothing" difficult to accept.  T451.  Mr. H.
endorsed feeling low energy, no ambition, and no motivation.  T451.  Mr. H.
was currently not taking any medication.  T451.  Mr. H.'s GAF was assessed at
53.  T453.

Mr. H. saw Brenda Artzen at Community Counseling Services on
September 5, 2017, to discuss medication and treatment options.  T761-62.
Mr. H.'s wife and daughter were also present and reported Mr. H. was "mean"
and "angry" most of the time, and Mr. H. agreed. T762.

Mr. H. saw Brenda Artzen at Community Counseling Services on
September 6, 2017, to work on paperwork for Social Security, and his mental

18

status revealed his "affect is in obvious pain" with psychomotor activity characterized as slowed reaction times.  T763.

Mr. H. was seen in the Neurology Clinic at the VA on September 11, 2017, for headaches occurring two times per week and lasting 2-3 days with blurred vision.  T513.  Mr. H. had tried Imitrex and gabapentin for the headaches without relief.  T514.  Mr. H. also complained of chronic low back pain and weakness in the left leg.  T514.  Mr. H. had tried chiropractic treatment, acupuncture, and physical therapy for his back without relief.  T514.  Examination revealed generalized weakness and decreased pinprick sensory in the left lower extremity, walking with a limp, unable to tandem walk, skeletomuscular tenderness, and positive straight leg raise test on the left.  T515.  Mr. H.'s assessments were chronic posttraumatic headaches, chronic low back pain with left lumbar radiculopathy, and compression fracture of T12.  T516.  Topamax was prescribed and a neurosurgery consult at Sanford was considered.  T516.

Mr. H. saw Brenda Artzen at Community Counseling Services on September 12, 2017, and on September 18, 2017, and his mental status revealed an anxious mood both times.  T764-66.

Mr. H. phoned the VA on September 27, 2017, and reported taking Topiramate as directed, but still had a headache of two days duration. T559-60.  Mr. H.'s Topamax dosage was increased.  T560.

Mr. H. saw Brenda Artzen at Community Counseling Services on September 25, 2017, and his mental status revealed an indifferent attitude,

and on October 3, 2017, his eye contact was fair and attitude indifferent when seen again.  T767-68.

Mr. H. was seen in the Neurology Clinic at the VA on October 12, 2017, for posttraumatic headaches occurring in the right temporoparietal region with right eye light sensitivity.  T555.  He was taking Topamax, but the headaches continued.  T555.  Mr. H. also complained of chronic low back pain and weakness in the left leg.  T555.  Examination revealed weakness in the left lower extremity, walking with a limp, skeletomuscular tenderness, and positive straight leg raise test on the left.  T557.  Topamax was continued, Inderal prescribed, and ibuprofen or meloxicam was to be used as an abortive therapy.  T558.

A thoracic MRI obtained on October 12, 2017, revealed a moderately severe chronic compression fracture at T12, mild chronic compression fracture at the superior endplates of T3 and T4, disc narrowing and desiccation from T6-7 through T9-10, small disc protrusion at T7-8 without spinal stenosis or cord compression, very small disc protrusion at T8-9 without spinal stenosis or cord compression, and a very small disc protrusion at T9-10 without spinal stenosis or cord compression.  T476.  A lumbar MRI obtained the same day revealed a transitional L5 vertebra partially sacralized on the right, chronic T12 compression fracture, and degenerative disc disease with mild disc bulging and very small disc protrusion at L4-5 without spinal stenosis or cord compression.  T477-78.

Mr. H. saw Brenda Artzen at Community Counseling Services on October 18, 2017, and his mental status revealed an anxious mood, he presented in pajama pants, and his attitude was open and cooperative.  T771.  The treatment notes from this visit indicate his follow-up was for reviewing his SSA disability application.  T772.

Mr. H. saw Seth Ahrendt, MD, at Community Counseling Services on October 19, 2017, for an initial psychiatric evaluation.  T773.  Mr. H.'s main complaint was increased irritability, along with low back pain and headaches.  T774.  His PHQ-9[5] score was 13, indicating moderate depression.  T774.  Mr. H. reported he had no significant prior history of psychiatric problems or taking psychiatric medications.  T774.  Mr. H. said his mood was irritable and sharp, more negative, had more mood swings, and felt upset about not being able to find work.  T774.  Mr. H. reported sleeping very little, decreased interest in activities, financial difficulties, feelings of hopelessness and helplessness, and low energy.  T774-75. The mental status exam was largely normal, and the diagnoses were depressive disorder, unspecified bipolar disorder, and mixed personality disorder.  T776.  Psychotropic medications were prescribed including Trazodone and Cymbalta.  T777.  This medication was determined to

---

[5] PHQ-9 is a self-administered patient questionnaire that has been shown to be valid for making criteria-based diagnoses of depressive disorders, and a reliable and valid measure of depression severity. *See* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1495268/ (last visited Jan. 6, 2021).  PHQ-9 scores range from 0 to 27 with a score of 10-14 indicating moderate depression, 15-19 moderately severe depression, and 20 and above indicating severe depression. *See* https://www.pcpcc.org/sites/default/files/resources/instructions.pdf at page 7 (last visited Mar. 26, 2021).

be good for his anxiety and depression symptoms as well as for Mr. H.'s pain. T777.

Mr. H. was seen at the VA Neurology Clinic on December 20, 2017, to follow up on headaches occurring two times per week and lasting 2-3 days with blurred vision.  T968-69.  He expressed that he was not taking any medications because the medications do not work.  T969.  Mr. H. also reported he would take meloxicam as needed, and he had tried Topamax, Imitrex, and gabapentin and none of them worked.  T969.  Neurological examination revealed lumbar spine tenderness and positive straight leg raise test on the left.  T970.

Mr. H. saw Seth Ahrendt, MD, at Community Counseling Services on December 21, 2017, for follow up on his psychiatric medications and diagnoses of depressive disorder and mixed personality.  T786-87.  Dr. Ahrendt noted that a lot of Mr. H.'s mental health complaints were due to his chronic pain. T787.  Mr. H. reported the Trazadone helps with his sleep, and the Cymbalta had been helping with his mood, but he didn't think it helped much with his chronic pain.  T787.  However, Mr. H. reported he was doing fairly well, and his mood was pretty good.  T787.  Mr. H. indicated he had not been following up with therapy because he was not interested.  T787.  He stated that overall, he felt he was doing much better since attending therapy and starting Cymbalta and he had no questions or concerns.  T787.  Mr. H.'s wife also reported he was less irritable and was doing fairly well.  T787.  His PHQ-9 score was 11, indicating moderate depression.  T789.  Mr. H.'s objective exam was largely normal, except he appeared much older than his age.  T788.  Mr. H. was polite,

22

pleasant, calm, alert, and oriented to person, place, and time.  T788.  His speech was clear, psycho-motor activity normal, mood euthymic, affect congruent, and thought process concrete.  T788.  In addition, there were no psychosis symptoms noted, his attention and concentration were fair, insight and judgment seemed fair to good, memory grossly intact, and intelligence average.  T788.  His medications were continued.  T788.

Mr. H. was seen at Avera Neurosurgery on January 15, 2018, for ongoing low back and left leg pain, and numbness and tingling.  T749.

Mr. H.'s PHQ-9 score was 14, indicating moderate depression.  T750.  A review of systems indicated headaches, back pain, weakness, numbness, tingling, anxiety, and depression.  T751.  Examination revealed tenderness with palpation to the lumbar spine and sciatic notch left, antalgic gait favoring the left leg, decreased sensory in the lateral foot bilaterally.  T751-52.  The impression was back and leg pain without evidence of radiculopathy.  T752.  Nerve conduction tests were ordered.  T752.

Mr. H. was seen at Avera Neurology on January 24, 2018, for lower extremity nerve conduction tests due to paresthesia.  T748.  The tests were normal.  T748.  Dr. Puumala of Avera Neurosurgery concluded that he saw no surgical options and recommended conservative options, referring Mr. H. back to Dr. Shaikh on February 5, 2018.  T804.

A general medical pension disability benefits questionnaire was completed by the VA on February 1, 2018.  T938.  Mr. H.'s disabling conditions were listed as headaches, chronic thoracic spine fracture of T3, T4, and T12

23

with degenerative changes, degenerative disc disease, and degenerative lumbar spine changes.  T939.  The questionnaire included the course, treatment, and symptoms for each of those conditions.  T939-61.

The general medical pension disability benefits questionnaire stated that Mr. H. had been diagnosed with a headache condition beginning in 2010, was seen in the neurology clinic in June 2011, and saw Dr. Poisson in neurology on December 20, 2017.  T946-47.  Mr. H. reported having headaches a couple of times per month, lasting several days, and the pain was debilitating when they were severe.  T947.  He reported feeling nauseous and unsteady with blurred vision during the headaches.  T947.  Mr. H. stated the headaches start in the back of his head and feel like a knot.  T947.  Mr. H. had received IV meds at the VA and had tried Excedrin, Ibuprofen, Asa, Amitriptyline, Metoclopramide, tramadol, etodolac, Imitrex, and muscle relaxants for his headaches.  T947.  A brain MRI obtained in February was normal.  T947.  Mr. H. was currently taking Topamax for headache prevention but continued to have headaches on a weekly basis.  T947.  The report stated that Mr. H.'s headaches impact his ability to work due to poor concentration when they occur and needing to take time off of work.  T950-51.

The general medical pension disability benefits questionnaire stated that Mr. H.'s thoracic spine condition impacted his ability to work due to chronic pain, and thoracolumbar spine motor testing was not feasible due to the potential for injury during testing due to his spine condition.  T961.

The VA issued a Rating Decision on February 2, 2018, based on their review of the evidence and concluded Mr. H. was entitled to a non-service-related pension.  T29.  The VA stated the pension was granted because "the evidence shows that you are unable to maintain substantially gainful employment due to your disability(ies)."  T30.  Mr. H.'s areas of disability assigned by the VA included headaches, depression, and compression fractures of T3, T4, and T12 with degenerative arthritis.  T30-31.  The VA found that the effective date for entitlement was October 11, 2017.  T31.

Mr. H. saw Dr. Ahrendt at the VA Psychiatry Clinic on February 9, 2018, for follow up on medication management and increased depression and anxiety.  T891.  Mr. H. reported overall doing well, but some recent increased anxiety with shortness of breath and sweating.  T891.  With regard to depression, he reported feeling a little low recently and related it to his chronic pain.  T892.  Mr. H.'s mental status examination revealed an appearance older than his age, fair attention and concentration, fair to good insight and judgment, and was otherwise normal.  T893.  Mr. H.'s diagnoses included depressive disorder and anxiety disorder, both due to a general medical condition.  T893.  Cymbalta and trazodone were continued, and Zoloft and Vistaril were added.  T893.

Mr. H. was seen in the primary care clinic at the VA on March 19, 2018, and reported his headaches were stable, intermittent but not debilitating. T929.  Acupuncture, massage, chiropractic, and PT were recommended.  T929. Mr. H. continued to follow with Avera Neurosurgery and Neurology for his back

pain.  T929.  Mr. H. was given Diclofenac gel for pain relief, and he said he didn't typically use anything else for pain, but limits his mobility accordingly. T929.  Mr. H. was instructed to use over the counter ibuprofen for pain relief. T929.

Mr. H. was referred back to Adil K. Shaikh, MD, at Avera Physical Medicine and Rehabilitation Clinic and was seen on April 23, 2018, to follow up on his low back pain.  T819-20.  Mr. H. reported that his back pain ranged from 5/10 to 10/10 mostly in the mid lower back area and goes down his left leg.  T820.  Mr. H. felt the radiating pain in his leg developed gradually the last few months.  T820.  Examination revealed some pain with back palpation, pain with range of motion in all directions, no radicular signs with range of motion, decreased sensation mostly at L4 and S1 but also L5 to some extent, and weakness in the ankle dorsiflexion and EHL on the left.  T820.  Amitriptyline and gabapentin were recommended for the radicular pain, and physical therapy and new MRIs ordered.  T821.

Mr. H. was seen at the VA emergency room on May 17, 2018, with progressive acute low back pain, chronic numbness on the left lower leg, and worsening numbness in the right lower leg the past week.  T925.  A Toradol injection was given, and prednisone and Flexeril prescribed.  T927.

A lumbar MRI obtained on May 24, 2018, revealed a transitional L5 vertebra partially sacralized on the right, chronic T12 compression fracture, unchanged, and moderate degenerative disc disease and mild disc bulging without spinal stenosis at L4-5, unchanged.  T872-73.

26

Mr. H. was seen by Dr. Shaikh at Avera Physical Medicine and Rehabilitation Clinic on June 1, 2018, to follow up on his low back pain.  T824. Examination revealed exquisite pain over the SI joint consistent with a positive Fortin's finger test, pain with extension of his back, less pain with forward flexion of his back, positive Gillet sign, positive FABER's, positive FADIR's, and mildly positive SI joint compression test, mild decreased sensation at L4, L5, and S1 levels, and continued mild weakness in ankle dorsiflexion and EHL on the left.  T825.  Mr. H.'s open book and close book signs were negative.  T825. An SI joint injection was administered, and Mr. H.'s gabapentin dosage was increased.  T826.

Mr. H. saw Dr. Ahrendt at the VA Psychiatry Clinic on June 8, 2018,[6] for follow up on medication management for his depression and anxiety.  T922. Mr. H. reported doing well.  T922.  His medications were continued.  T924.

Mr. H. saw Colette Tolley, MEd, MS, LPC, QMHP, at Community Counseling Services on July 23, 2018, for counseling.  T1000.  Mr. H.'s mood was depressed and affect appropriate.  T1000.  Mr. H. reported he was trying to manage his chronic pain while still trying to care for his granddaughter. T1001.

Mr. H. saw Ms. Tolley at Community Counseling Services on August 6, 2018. for counseling.  T1003.  Mr. H.'s mood was depressed and affect appropriate.  T1003.  Mr. H. reported he was concerned about his disability

---

[6] The parties' joint statement of material fact gives June 11, 2018, as the date of this visit.  However, the administrative record shows this visit occurred on June 8, 2018.

and didn't like the idea of being disabled, but struggled with his limitations. T1004.

Mr. H. was seen by Dr. Shaikh at Avera Physical Medicine and Rehabilitation Clinic on August 20, 2018, to follow up on his low back pain. T830.  The increased dosage of gabapentin had not helped, and the SI joint injection seemed to take the pain away for about two weeks then it gradually returned.  T831.  Physical therapy had made his pain worse.  T832. Examination revealed exquisite pain over the SI joint in the right, but the pain was now codominant with the pain going down his legs, mild decreased sensation at L4, L5, and S1 levels, and continued mild weakness in ankle dorsiflexion and EHL unchanged, and his SI joint compression test was mildly positive.  T831.  Mr. H. was to wean off gabapentin, and an epidural injection was planned for the radicular pain.  T832.

Mr. H. was seen at the Avera Pain Clinic on August 24, 2018, for an epidural injection at L4-5 due to low back pain with pain radiating down both legs and feet.  T807.

Mr. H. met with his caseworker at Community Counseling Services on September 5, 2018, and his mood was visibly in pain and walking with a limp. T1010.  His mood was "off," eye contact fair, and psychomotor activity was characterized by limping and walking in visible pain.  T1010.

Mr. H. met with his caseworker at Community Counseling Services on September 12, 2018, and his mood was anxious, and he presented in an unkempt fashion.  T1011.  Mr. H. met again with his caseworker on September

14, 2018, and his mood was nervous, agitated, in visible pain, and anxious, and his attitude was described as indifferent.  T1012-13.

Mr. H. was seen by Dr. Shaikh at Avera Physical Medicine and Rehabilitation Clinic on September 17, 2018, to follow up on his low back pain. T835.  The epidural injection had not helped at all.  T836.  Examination revealed exquisite pain over the SI joint on the left, mild decreased sensation at L4, L5, and S1 levels, and continued mild weakness in ankle dorsiflexion and EHL unchanged, and his FABER's, FADIR's, and SI joint compression test on the left were positive.  T836.  An SI joint injection was administered on the right.  T836.

Mr. H. met with his caseworker at Community Counseling Services on September 19, 2018, and he was in obvious pain, walking slowly with a definite limp, and he had difficulty walking or sitting.  T1014.  His psychomotor activity was characterized by difficulty remaining seated.  T1014.  Mr. H. reported no benefit from a recent injection and was frustrated at having no solution for his pain.  T1014.

Mr. H. met with his caseworker at Community Counseling Services on October 3, 2018, and his mood was blunt/direct and he appeared to be in pain.  T1016.

Mr. H. saw Erik Peterson, MD, at the VA Psychiatry Clinic on October 5, 2018, for follow medication management related to his depression and anxiety. T919.  Mr. H. reported his mood had been down due to not being able to work or engage in activities.  T919.  Mr. H. stated he was seeing "Collete" in Madison

weekly for therapy and "Brenda" in Madison every two weeks for help with his disability application. T920. His diagnoses included depression and anxiety due to general medical condition, and his medications were continued with an increase in the Zoloft and Cymbalta dosages. T921.

Mr. H. was seen by Dr. Shaikh at Avera Physical Medicine and Rehabilitation Clinic on November 1, 2018, to follow up on his low back pain. T840-42. Mr. H.'s pain varied from 6 to 8/10, but he reported he was able to tolerate and cope with the pain. T841. Examination revealed some continued mild discomfort in the SI joint area, but no pain with extension or flexion of his back, decreased sensation at L4, L5, and S1 levels, and continued mild weakness in ankle dorsiflexion and EHL unchanged. T841. Mr. H. ambulated easily with a cane, even carrying his grandchild. T841. His straight leg raise test, FABER's, and FADIR's were also negative. T841. A chronic pain program was discussed, but Mr. H. declined, stating he felt he was dealing with life okay, and the doctor felt this was fine. T842.

Dr. Shaikh of Avera Physical Medicine and Rehabilitation Clinic, Mr. H.'s treating rehabilitation specialist, completed a Physical Residual Functional Capacity Assessment form utilizing a Social Security authored form on January 18, 2019. T1040-47. Dr. Shaikh stated Mr. H.'s primary diagnosis was chronic pain and T12 Burst was his secondary diagnosis. T1040. The form defined limitations in terms of a workday, and "frequently" meant occurring up to two-thirds of an 8-hour workday and "occasionally" up to one-third of an 8-hour workday. T1040. Dr. Shaikh indicated that Mr. H. could only lift 10

pounds up to two-thirds of an 8-hour workday, stand and/or walk at least two hours in an 8-hour workday, and sit less than 6 hours of an 8-hour workday. T1041.  Dr. Shaikh indicated Mr. H. was limited in his upper extremities to pushing and/or pulling less than 20 pounds.  T1041.  Dr.  Shaikh indicated Mr. H. had postural limitations and should never perform climbing, balancing, stooping, kneeling, crouching, or crawling during an 8-hour workday because most back movements increased Mr. H.'s pain.  T1042.  Dr. Shaikh indicated Mr. H. was limited in reaching in all directions and explained that reaching could increase back pain.  T1043.  Dr. Shaikh stated he did not evaluate Mr. H.'s visual ability, Mr. H. had no communicative limitations, and Mr. H. should avoid extreme cold because it could increase back pain.  T1043-44.

Mr. H. saw Dr. Peterson at the VA Psychiatry Clinic on January 4, 2019,[7] for medication management related to his depression and anxiety.  T906. Mr. H. reported he was not as stressed out, but rated his depression as a 7 out of 10, his anxiety is higher, and he still gets irritable and angry at times.  T906. Mr. H. denied feeling hopeless, helpless, or worthless.  T906.  Mr. H. said he would like to return to interests and hobbies but cannot due to physical limitations and chronic pain.  T906.

Mr. H. reported he was no longer taking medication for pain.  T906.

Mr. H. stated he was seeing "Collete" in Madison weekly for therapy and "Brenda" in Madison every two weeks for help with his disability application.

---

[7] The parties' joint statement of material fact gives January 5, 2019, as the date of this visit.  However, the administrative record shows this visit occurred on January 4, 2019.

T906.  His diagnoses included depression and anxiety due to general medical condition, and his medications were continued with an increase in the Vistaril dosage.  T907.

Mr. H. met with his caseworker at Community Counseling Services on January 23, 2019, to review his disability paperwork.  T1052-53.  Mr. H.'s mood was depressed, he presented in a disheveled fashion, and psychomotor activity was characterized by slowed reaction times.  T1053.

Mr. H. met with his caseworker at Community Counseling Services on February 4, 2019, to prepare more paperwork for his upcoming disability hearing.  T1055.  His psychomotor activity was characterized by being slow to move, in obvious pain, and having difficulty walking or standing.  T1055.

Mr. H. met with his caseworker and attorney at Community Counseling Services on February 18, 2019, to discuss the records and expectations for the disability hearing.  T1057-58.  Mr. H.'s psychomotor activity was characterized by psychomotor retardation, visibly in pain, and walking with a limp foot. T1058.

## C.     State Agency Assessments:

The State agency medical consultant at the initial level reviewed the file on November 18, 2017, and concluded Mr. H. had a severe impairment of Spine Disorders and a non-severe impairment of headaches.  T70, 73.  The consultant concluded Mr. H. was limited to lifting 20 pounds occasionally, 10 pounds frequently, standing or walking six hours per workday, sitting more than six hours per workday, occasionally climbing ramps/stairs,

32

ladders/ropes/scaffolds, stooping, crouching, and crawling, frequently kneeling, and unlimited balancing.  T72-73.  The consultant did not note any requirement for a sit/stand alternative.  T72-73.  The State agency medical consultant at the reconsideration level made similar findings on February 20, 2018, however, the consultant did not indicate whether Mr. H.'s headache impairment was severe.  T94-98.

The State agency at the initial level had the file reviewed for mental health impairments by "Joel Deloy" on November 17, 2017.  Mr. Deloy concluded the record did not establish a medically determinable mental health impairment.  T70.

The State agency psychological consultant at the reconsideration level reviewed the file on February 20, 2018, and concluded Mr. H. had medically determinable mental health impairments of depressive, bipolar and related disorders and a personality disorder that were non-severe.  T94-95.  The consultant found that Mr. H.'s non-severe mental impairments caused mild limitations in his ability to understand, remember or apply information; interact with others; concentrate, persist, or maintain pace, and in his ability to adapt or manage oneself.  T94-95.  The State agency psychological consultant at the reconsideration level did not complete an RFC assessment. T94-95.

## D.    Other Evidence

Mr. H. completed a Headache Questionnaire on September 19, 2017, as part of his disability application and stated he had headaches since his fall off

33

the scaffolding.  T291-92.  He said they occurred about two times per month in the past six months, and his last headache lasted for three days.  T291.  He described his headaches as feeling like he was hit on the top of his head on the right side, eyes get blurry, head feels twice its size, constant non-pounding pain, that starts as an itching sensation, then pressure, then pain, and they last about three days.  T292.  Mr. H. stated he had not found any medications that provided relief but had recently started taking Topiramate.  T292.

**E.   Testimony at ALJ Hearing:**

Mr. H.'s hearing occurred on March 13, 2019, and lasted 32 minutes; starting at 12:27 PM and ending at 12:59 PM.  T42, 62.

**1.   Mr. H.'s Testimony:**

Mr. H. testified that his last job was in hotel maintenance, and it ended about a month after he was injured.  T44.

Mr. H. testified that he did not have health insurance, but was covered through the VA.  T44.

Mr. H. testified that he had pain all the time in his low, midback and down his left leg.  T46-47.  He said standing, walking, sitting, bending over, turning side to side, and pretty much any movement makes his pain worse, and laying down helps relieve the pain.  T47.  Mr. H. testified he could not get comfortable sleeping and he gets up every couple of hours to move around to avoid getting stiff.  T51-52.  Mr. H. testified his concentration and focus is affected by his pain.  T53.  Mr. H. said it was painful to kneel, crouch or crawl. T55.

34

Mr. H. testified he had headaches three or four times per week lasting three to four hours, and he took Meloxicam for the headaches, which helped. T47.

Mr. H. testified he could lift about 10 pounds, stand about 10 to 20 minutes, walk less than a block, and sit less than five minutes.  T48.

Mr. H. said he uses a cane when he is walking, and the cane was prescribed by a doctor.  T52.

Mr. H. testified that typically he gets up in the morning and gets his granddaughters breakfast and gets them dressed then sits on the couch.  T48. He said he sits probably 10 to 20 minutes then has to get up and do something, because "[he's] starting to, trying to get, trying to think about getting rid of the pain."  T49.  He said he would then go to the kitchen or something or walk around and then come back to the living room and sit down again.  T49. He testified that he sits on the couch about 30 minutes a day and is laying on the couch the rest of the day.  T49.

Mr. H. said that, after getting his granddaughters up in the morning, his wife provides the rest of their care.  T49.  Mr. H. was asked if he had any problems lifting or carrying his granddaughters, and Mr. H. testified that he only had problems with the older one who was heavier, about 30 or 40 pounds, but she walks now.  T49-50.

Mr. H. said he tries to avoid snow removal, but if he does any it is with a self-propelled blower for about 20 minutes.  T50.  Mr. H. said he mows, but on a riding lawn mower and it causes him pain.  T51.  Mr. H. said he tries to do

house chores such as dishes, but can only do them for 5 to 10 minutes before he needs to sit down or do something else.  T51.

### 2.   **Vocational Expert Testimony:**

The ALJ asked the VE a hypothetical question that mirrored the limitations included in the RFC determined by the ALJ, and the VE testified that the hypothetical individual would be unable able to perform past work as identified by the ALJ.  T57-59.  The VE testified there would be other jobs the individual could perform and identified the occupations of electronics worker, DOT# 726.687-010; circuit board assembler, DOT# 726.687-038, and wafer cleaner, DOT# 590.685-062, and provided the number of jobs available nationally for each occupation.  T57-58.  The VE testified that these jobs were "seated, light jobs."  T58.

The VE testified that if an individual needed to lay down half of the workday, they would not be employable.  T59.

The VE testified that an individual limited similarly as described by Dr. Shaikh's medical source statement found at Exhibit 19F, would be unemployable.  T60-61.

The VE testified that his testimony regarding laying down, use of a cane, and the sit/stand option was not addressed in the Dictionary of Occupational Titles and was based on his "work experience."  T59.

36

## DISCUSSION

### A.    Standard of Review

When reviewing a denial of benefits, the court will uphold the Commissioner's final decision if it is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); <u>Minor v. Astrue</u>, 574 F.3d 625, 627 (8th Cir. 2009).  Substantial evidence is defined as more than a mere scintilla, less than a preponderance, and that which a reasonable mind might accept as adequate to support the Commissioner's conclusion.  <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Klug v. Weinberger</u>, 514 F.2d 423, 425 (8th Cir. 1975).  "This review is more than a search of the record for evidence supporting the [Commissioner's] findings, . . ., and requires a scrutinizing analysis, not merely a rubber stamp of the [Commissioner's] action."  <u>Scott ex rel. Scott v. Astrue</u>, 529 F.3d 818, 821 (8th Cir. 2008) (internal quotations and citations omitted).  Yet, "[i]n conducting [its] limited and deferential review of the final agency determination under the substantial-evidence standard, [the court] must view the record in the light most favorable to that determination.  <u>Chismarich v. Berryhill</u>, 888 F.3d 978, 980 (8th Cir. 2018).

In assessing the substantiality of the evidence, the evidence that detracts from the Commissioner's decision must be considered, along with the evidence supporting it.  <u>Minor</u>, 574 F.3d at 627.  The Commissioner's decision may not be reversed merely because substantial evidence would have supported an opposite decision.  <u>Woolf v. Shalala</u>, 3 F.3d 1210, 1213 (8th Cir. 1993); <u>Reed v. Barnhart</u>, 399 F.3d 917, 920 (8th Cir. 2005).  If it is possible to draw two

inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Commissioner must be affirmed.  Oberst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993).  "In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record."  Mittlestedt v. Apfel, 204 F.3d 847, 851 (8th Cir. 2000) (citations omitted).

The court must also review the decision by the ALJ to determine if an error of law has been committed.  Smith v. Sullivan, 982 F.2d 308, 311 (8th Cir. 1992); 42 U.S.C. § 405(g).  Specifically, a court must evaluate whether the ALJ applied an erroneous legal standard in the disability analysis.  Erroneous interpretations of law will be reversed.  Walker v. Apfel, 141 F.3d 852, 853 (8th Cir. 1998) (citations omitted).  The Commissioner's conclusions of law are only persuasive, not binding, on the reviewing court.  Smith, 982 F.2d at 311 (finding "appropriate deference" should be given to the SSA's interpretation of the Social Security Act).

**B.     The Disability Determination and the Five-Step Procedure**

Social Security law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. §§ 416(I), 423(d)(1)(A); 20 C.F.R. § 404.1505.[8]  The

---

[8] Although Mr. H. has applied for both Title II and Title XVI benefits, for the sake of simplicity, the court herein cites to only the regulations applicable to Title II where the corresponding Title XVI regulation is identical.  It is

impairment must be severe, making the claimant unable to do his previous work, or any other substantial gainful activity which exists in the national economy.  42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

The ALJ applies a five-step procedure to decide whether an applicant is disabled.  This sequential analysis is mandatory for all SSI and SSD/DIB applications.  Smith v. Shalala, 987 F.2d 1371, 1373 (8th Cir. 1993); 20 C.F.R. § 404.1520.  The five steps are as follows:

> **Step One**: Determine whether the applicant is presently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b).  If the applicant is engaged in substantial gainful activity, he is not disabled and the inquiry ends at this step.
>
> **Step Two**: Determine whether the applicant has an impairment or combination of impairments that are *severe*, i.e., whether any of the applicant's impairments or combination of impairments significantly limit his physical or mental ability to do basic work activities.  20 C.F.R. § 404.1520(c).  If there is no such impairment or combination of impairments, the applicant is not disabled and the inquiry ends at this step.  NOTE: the regulations prescribe a special procedure for analyzing mental impairments to determine whether they are severe.  Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992); 20 C.F.R. § 404.1520a.  This special procedure includes completion of a Psychiatric Review Technique Form (PRTF).
>
> **Step Three**: Determine whether any of the severe impairments identified in Step Two meets or equals a "Listing" in Appendix 1, Subpart P, Part 404.  20 C.F.R. § 404.1520(d).  If an impairment meets or equals a Listing, the applicant will be considered disabled without further inquiry.  Bartlett v. Heckler, 777 F.2d 1318, 1320 n.2 (8th Cir. 1985).  This is because the regulations recognize the "Listed" impairments are so severe that they prevent a person from pursuing any gainful work.  Heckler v. Campbell, 461 U.S. 458, 460 (1983).  If the applicant's impairment(s) are *severe* but do not meet or equal a *Listed impairment*, the ALJ must proceed to step

---

understood that both Titles are applicable to Mr. H.'s application.  Any divergence between the regulations for either Title will be noted.

four.  NOTE: The "special procedure" for mental impairments also applies to determine whether a severe mental impairment meets or equals a Listing.  20 C.F.R. § 1520a(c)(2).

**Step Four**: Determine whether the applicant is capable of performing past relevant work (PRW).  To make this determination, the ALJ considers the limiting effects of all the applicant's impairments, (even those that are not *severe*) to determine the applicant's residual functional capacity (RFC).  If the applicant's RFC allows him to meet the physical and mental demands of his past work, he is not disabled.  20 C.F.R. §§ 404.1520(e); 404.1545(e).  If the applicant's RFC does not allow him to meet the physical and mental demands of his past work, the ALJ must proceed to Step Five.

**Step Five**: Determine whether any substantial gainful activity exists in the national economy which the applicant can perform.  To make this determination, the ALJ considers the applicant's RFC, along with his age, education, and past work experience.  20 C.F.R. § 404.1520(f).

## C.    Burden of Proof

The plaintiff bears the burden of proof at steps one through four of the

five-step inquiry.  Barrett v. Shalala, 38 F.3d 1019, 1024 (8th Cir. 1994);

Mittlestedt, 204 F.3d at 852; 20 C.F.R. § 404.1512(a).  The burden of proof

shifts to the Commissioner at step five.  Nevland v. Apfel, 204 F.3d 853, 857

(8th Cir. 2000); Clark v. Shalala, 28 F.3d 828, 830 (8th Cir. 1994).  "This

shifting of the burden of proof to the Commissioner is neither statutory nor

regulatory, but instead, originates from judicial practices."  Brown v. Apfel, 192

F.3d 492, 498 (5th Cir. 1999).  The burden shifting is "a long-standing judicial

gloss on the Social Security Act."  Walker v. Bowen, 834 F.2d 635, 640 n.3 (7th

Cir. 1987).  Moreover, "[t]he burden of persuasion to prove disability and to

demonstrate RFC remains on the claimant, even when the burden of

production shifts to the Commissioner at step five." Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004).

**D.    Mr. H.'s Assignments of Error**

Mr. H. asserts the Commissioner erred by: (1) failing to identify all Mr. H.'s severe impairments; (2) determining an RFC that is not supported by substantial evidence; (3) failing to consider evidence submitted to the Appeals Council; and (4) by finding the Commissioner carried his burden at Step 5 to identify jobs Mr. H. could perform based on substantial evidence. See Docket No. 17 at p. 1.

The Commissioner asserts the ALJ's decision is supported by substantial evidence in the record and the decision should be affirmed. See Docket No. 19. Mr. H.'s assignments of error are discussed in turn below.

**1.    Whether the Commissioner Failed To Identify All of Mr. H.'s Severe Impairments**

The ALJ's written decision is contained at T8-27. That portion of the ALJ's analysis wherein the ALJ identifies Mr. H.'s impairments at step two is found on pages 4-5 (T14-15) of the written decision. Mr. H. asserts the ALJ failed to properly identify his headache condition as a severe impairment. The ALJ identified the following medically determinable severe impairments: (1) history of closed head injury with skull fracture; (2) T12 burst fracture; (3) lumbar degenerative disc disease with L4-5 disc herniation with mild stenosis; and (4) right lateral femoral cutaneous nerve syndrome. The ALJ also identified medically determinable impairments of depressive disorder and anxiety disorder, but concluded they were non-severe.

Mr. H. asserts the ALJ should have discussed his headache impairment in its step two and step three evaluations.  At step two, it is the claimant's burden to demonstrate a (1) severe and (2) medically determinable impairment, but the burden is not difficult to meet.  Kirby v. Astrue, 500 F.3d 705, 707-08 (8th Cir. 2007); Caviness v. Massanari, 250 F.3d 603, 605 (8th Cir. 2001).  An ALJ's failure to identify a severe impairment is reversible error.  Nicola v. Astrue, 480 F.3d 885, 886-87 (8th Cir. 2007).

An impairment is "medically determinable" if it results from "anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques."  See 20 C.F.R. § 404.1521.  "Therefore, a physical or mental impairment must be established by objective medical evidence from an acceptable medical source."  Id.  If an impairment is medically determinable, then the Commissioner next considers whether it is severe.  Id.

An impairment is not severe if it does not significantly limit the claimant's physical or mental ability to do basic work activities.[9]  See 20 C.F.R. § 404.1522(a).  Basic work activities include, but are not limited to: walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, handling, seeing, hearing, speaking, use of judgment; responding appropriately to supervisors and co-workers and usual work situations, dealing with changes in a routine

---

[9] Paradoxically, the Commissioner's regulations do not define "severe," but rather define what is "not severe."  The inference from the regulation is that a severe impairment *does* significantly limit a claimant's physical or mental ability to do basic work activities.

work setting, and understanding, carrying out, and remembering simple instructions.  Id. at (b).  At step two, only medical evidence is evaluated to assess the effects of an impairment on the ability to perform basic work activities.  See Social Security Ruling ("SSR") 85-28, 1985 WL 56856, at *2 (1985).  Therefore, subjective complaints by the claimant are normally not part of the step two analysis.  Id.

Mr. H. asserts the ALJ erred by failing to make any finding related to his headache impairment in step two.  See Docket No. 17 at p. 3.  He also argues that he met his burden to show a severe headache impairment, citing medical records showing neurology treatment by specialists for his headaches.  See Docket No. 17 at p. 5.  Mr. H. also argues the ALJ's error was not harmless because the ALJ did not consider his headaches at all when determining his RFC.  See Docket No. 17 at p. 6.

An ALJ must explain the basis for their decision and not leave the reviewing court to "speculate on what basis the Commissioner denied a . . . claim."  Collins v. Astrue, 648 F.3d 869, 872 (8th Cir. 2011).  If there is any doubt as to whether a claimant has met their burden to show a severe impairment, it is to be resolved in favor of the claimant.  Dewald v. Astrue, 590 F. Supp. 2d 1184, 1199 (D.S.D. 2008).  All medically determinable impairments, both severe and non-severe, must be considered when determining a claimant's ability to perform past work or other work.  Spicer v. Barnhart, 64 Fed. App'x 173, 175 (10th Cir. 2003); 20 CFR 404.1545(e); SSR 96-8p, 1996 WL 374184, at *5 (1996).

In the brief filed in support of its motion to affirm the ALJ's decision, the Commissioner argues Mr. H. has not met his burden to show his headaches were a severe impairment at step two.  See Docket No. 19 at p. 8.  The Commissioner also asserts the ALJ *did* consider Mr. H.'s headaches when making its RFC finding.  The ALJ noted Mr. H. testified that he suffered headaches three to four times per week, and they lasted three to four hours at a time.  T16-17, 53.  The Commissioner asserts that, although Mr. H. alleges that the ALJ should have found his headaches to be a severe impairment, he testified that he could "maintain" the headaches with medication.  T53.  The Commissioner cites Schultz v. Astrue, 479 F.3d 979, 983 (8th Cir. 2007), for the proposition that an impairment cannot be considered disabling if it can be controlled by medication.  The Commissioner also notes Mr. H. was taking ibuprofen to treat his headache symptoms, and cites Harris v. Barnhart, 356 F.3d 926, 930 (8th Cir. 2004), for the proposition that the use of nonprescription medication to treat a symptom is inconsistent with disabling pain.

While the record indicates Mr. H. complained of headaches and received neurological care to treat them, the Commissioner notes Mr. H. generally reported that they were not migraines.  T514, 555, 562, 739.  The Commissioner also argues Mr. H. did not identify any work-related limitations associated with his headaches, a showing necessary for a finding of severe impairment.  20 C.F.R. § 404.1520(c), 404.1522(a).

The Commissioner also argues the ALJ's failure to specifically discuss Mr. H.'s headaches at step two was an inadvertent drafting error that does not require remand because the ALJ demonstrated that it considered the headache condition throughout its analysis.  This is because, as the Commissioner argues, any error was harmless—even if Mr. H. made a threshold showing of a severe impairment—because the ALJ continued with the sequential evaluation process and considered all impairments, both severe and non-severe in its RFC finding.  See Johnson v. Comm'r of Soc. Sec., Civil No. 11-cv-1268 (JRT/SER), 2012 WL 4328413, at *21 (D. Minn. July 11, 2012) ("[T]he failure to find additional impairments at Step Two does not constitute reversible error when an ALJ considers all of a claimant's impairments in the remaining steps of a disability determination.").

In reply, Mr. H. argues the Commissioner's arguments are improper *post hoc* revisions of the ALJ's decision, and its articulated bases, which the court cannot consider because the ALJ did not raise them in its decision.  This argument is known as the Chenery doctrine, named for SEC v. Chenery Corp., 318 U.S. 80, 87-88 (1943), and under this doctrine the Commissioner cannot generate on appeal new bases for the ALJ's conclusion.  In Chenery, the Supreme Court held that when a court is reviewing an agency decision, the reviewing court is limited to examining agency action on "the grounds upon which the Commission itself based its action." Id. at 88.  The Eighth Circuit has interpreted Chenery to stand for the premise that "a reviewing court may not uphold an agency decision based on reasons not articulated by the agency[]

when the agency has failed to make a necessary determination of fact or policy upon which the court's alternative basis is premised." Banks v. Massanari, 258 F.3d 820, 824 (8th Cir. 2001) (quotation and brackets omitted). See also Michigan v. EPA, 576 U.S. 743, 758 (2015) (stating it is a "foundational principle of administrative law that a court may uphold agency action only on the grounds that the agency invoked when it took the action."). "Chenery demands that an ALJ provid[e] reasoning behind his determination of fact or policy so that a reviewing court can perform the requisite judicial review." Nills v. Saul, No. 5:18-CV-05079-KES, 2019 WL 6078643, at *5 (D.S.D. Nov. 15, 2019).

Mr. H. argues that the Commissioner's arguments that (1) he testified his headaches could be maintained by medication, (2) he offered no further testimony suggesting his headaches caused work-related limitations, (3) his allegations needed to be weighed against the statements of his doctors, (4) he reported his headaches were not migraines, and (5) he never required emergency room treatment for his headaches amount to impermissible *post hoc* rationalizations because the ALJ did not cite these as reasons for finding Mr. H.'s headache condition was not an impairment at step two. See Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168-69 (1962) ("The courts may not accept appellate counsel's *post hoc* rationalizations for agency action; Chenery requires that an agency's discretionary order [may] be upheld, if at all, on the same basis articulated in the order by the agency itself.").

In <u>Burlington Truck Lines, Inc. v. United States</u>, the Supreme Court addressed this issue.  The Court noted the Administrative Procedures Act allows court to determine whether agencies have properly exercised their discretion within the bounds expressed by the legislative delegation of power.  371 U.S. at 167-68.  In order for courts to make this determination, the agency must "disclose the basis of its order."  <u>Id.</u> at 168.  "The agency must make findings and support its decision, and those findings must be supported by substantial evidence."  <u>Id.</u>  Where the agency did not express a particular rationale for its decision, and counsel on appeal supplied a rationale, the Court rejected counsel's *post hoc* rationale because it was never expressed by the agency in its decision.  <u>Id.</u>

Nowhere in its decision did the ALJ explain its step two findings as to Mr. H.'s headache condition in the terms offered by the Commissioner in this appeal.  Specifically, the ALJ did not find that Mr. H.'s headaches were not a severe impairment at step two because they could be maintained by medication, that Mr. H. offered no further testimony to suggest they caused work-related limitations, that Mr. H.'s allegations about his headaches were belied by his doctors' statements, that the headaches were not migraines, and that Mr. H. never required emergency treatment for his headaches.  In fact, the ALJ did not mention Mr. H.'s headache condition at step two whatsoever.  Therefore, the arguments the Commissioner now offers are all *post hoc* rationales supplied for the first time herein.

47

The ALJ's decision referenced Mr. H.'s headaches only in descriptive terms at step four, e.g., stating that Mr. H. testified that he experiences headaches three or four times per week, and they last three or four hours apiece, stating that the headaches were controlled while Mr. H. was hospitalized immediately after his fall, and listing headaches among other pain symptoms Mr. H. experienced.  T16-17.  Now, for the first time, the Commissioner is attempting to rationalize the ALJ's omission of Mr. H.'s headache condition from step two with arguments and analysis notably absent from the ALJ's decision.  The court rejects these rationales.

Having found the Commissioner's arguments run afoul of Chenery, the court considers Mr. H.'s arguments as to step two.  Mr. H. cites Nicola v. Astrue, 480 F.3d 885, 886-87 (8th Cir. 2007), for the proposition that the failure to identify a severe impairment at step two is not harmless error but is instead grounds for reversal.  In Nicola, the severe impairment the claimant alleged the ALJ failed to identify was borderline intellectual functioning.  Id. at 887.  The Eighth Circuit noted such a diagnosis should be considered severe when it is supported by sufficient medical evidence.  Id.  The court held the ALJ's failure to identify the impairment as severe was not harmless error.  Id. The court reversed and remanded the case to the Commissioner for further proceedings.  Id.

As noted in Lund v. Colvin, Civ. No. 13-113 (JSM), 2014 WL 1153508, at *26 (D. Minn. Mar. 21, 2014), the district courts within the Eighth Circuit have disagreed about the holding in Nicola.  Some courts have interpreted it to mean

that an ALJ's erroneous step-two failure to include an impairment as severe warrants reversal and remand, even when the ALJ found other impairments to be severe and therefore continued sequential analysis.  Id.  Other courts have declined to interpret Nicola as establishing a *per se* rule that any error at step two is reversible error, so long as the ALJ continues with the sequential analysis.  Id. (gathering cases).  The central theme in the cases which hold reversal is not required is that "an error at Step Two may be harmless where the ALJ considers all of the claimant's impairments in the evaluation of the claimant's RFC."  Lund, 2014 WL 1153508, at *26 (quotation omitted).

More recently, this district has interpreted Nicola to require reversal for failure to properly identify a severe impairment at step two when that impairment is diagnosed and properly supported by sufficient medical evidence.  See Quinn v. Berryhill, No. 4:17-CV-04013-KES, 2018 WL 1401807, at *5-6 (D.S.D. Mar. 20, 2018) (error at step two not harmless where ALJ failed to identify medically determinable impairments).  In Quinn, the court acknowledged the district court split within the Eighth Circuit as described in Lund but decided that the error in Quinn's case was not harmless.  Id. at *6.

> Here, the ALJ did not mention Quinn's obesity, and he did not make a finding as to whether Quinn's scoliosis or neck impairment—which he noted Quinn testified about—were medically determinable impairments that were either severe or not severe.  There is evidence in the record to support such diagnoses, so they should have been addressed in the step two analysis.  Because medically determinable impairments are so important to the RFC analysis at step four, the court finds that the ALJ's insufficient findings regarding Quinn's medically determinable severe

> impairments at step two require remand for further
> development.

Id.

In Quinn, the court noted the claimant's burden to demonstrate a severe medically determinable impairment at step two, but emphasized the burden is not difficult to meet and any doubt about whether the claimant has met their burden is resolved in favor of the claimant.  Quinn, 2018 WL 1401807, at *5 (Caviness v. Massanari, 250 F.3d 603, 605 (8th Cir. 2001); Dewald v. Astrue, 590 F. Supp. 2d 1184, 1199 (D.S.D. 2008) (citing SSR 85-28)).

An impairment is not severe if it does not significantly limit the claimant's physical or mental ability to do basic work activities.  See 20 C.F.R. § 404.1522(a).  Basic work activities include, but are not limited to, walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, handling, seeing, hearing, speaking, use of judgment, responding appropriately to supervisors and co-workers and usual work situations, dealing with changes in a routine work setting, and understanding, carrying out, and remembering simple instructions.  Id. at (b).

Similar to the Quinn case, Mr. H. argues that the ALJ's failure to consider his headache condition as a severe impairment is not harmless error because the ALJ's analysis was silent as to whether it considered this condition a medically determinable impairment at all and, if so, whether they were severe or not severe and, finally, what effect, if any, those conditions had upon Mr. H.'s RFC at step four.  The court therefore endeavors to determine whether the ALJ erred by failing to categorize Mr. H.'s headache condition as a severe

impairment and, if so, whether that error in this instance constitutes reversible error under <u>Nicola</u> as interpreted through the lens of <u>Lund</u> and <u>Quinn</u>.

Here, the court must agree with Mr. H. that the ALJ utterly failed to explain whether it considered his headache condition a medically determinable impairment—let alone explain whether the ALJ considered it to be severe or not severe.  This failure constitutes reversible error because this medical condition was diagnosed and is properly supported by sufficient medical evidence in the record.

Mr. H.'s headache condition is clearly diagnosed and well-documented in the medical records.  On September 11, 2017, Mr. H. was seen by neurologist Dr. Poisson at the VA hospital for his headaches, which were charted as occurring twice per week and lasting two to three days.  T513.  Dr. Poisson charted that the headaches were associated with blurred vision, and Mr. H. denied experiencing migraine headaches.  <u>Id.</u>  Dr. Poisson diagnosed Mr. H. with chronic posttraumatic headaches.  T516.  Mr. H. continued treating with Dr. Poisson at the VA Neurology Clinic for posttraumatic headaches, and Dr. Poisson's medical records were contained in the administrative record.  On October 12, 2017, Dr. Poisson treated Mr. H. for posttraumatic headaches and, although Mr. H. stated he did not think he was experiencing migraines, he reported his headaches were located in the right temporoparietal region and that his right eye was sensitive to light.  T555.  Dr. Poisson continued Mr. H.'s Topamax prescription, prescribed Inderal, and suggested ibuprofen or meloxicam as an abortive therapy.  T558.  Dr. Poisson treated Mr. H. again on

December 20, 2017, for posttraumatic headaches.  T968-69.  On this date,
Mr. H. reported that none of the medications he had been taking worked; these
medications included Topamax, Imitrex, and gabapentin.  T969.  Mr. H.
reported that the headaches occurred twice per week and lasted two to three
days.  T969.  Mr. H. reported blurred vision associated with the headaches and
complained of experiencing a foul smell that triggered his headaches.  Id.

The VA hospital considered this condition as part of a General Medical –
Pension Disability Benefit Evaluation in February 2018.  T938-40.  The VA
listed migraine headaches as Mr. H.'s first diagnosis and indicated he had been
diagnosed with migraine headaches in 2010, before his fall.  T939.  Mr. H. was
first seen by the neurology department at the VA hospital in June 2011.
T946-47.  The VA evaluation noted Mr. H.'s headache symptomology, in
addition to the many prescription and over-the-counter medications Mr. H. had
tried to treat his headache condition.  T947-48.  The evaluation noted that
Mr. H. experienced headache pain at the back of his head and that he
experienced nausea and sensitivity to light along with the headaches.
T949-50.  The evaluation noted that Mr. H. claimed poor concentration during
headaches and, due to their frequency, he would have to take time off work.
T951.  The VA concluded Mr. H.'s headaches affected his ability to "maintain
substantially gainful employment" and concluded that the evidence showed

that Mr. H. was disabled due to, among other impairments, migraine headaches.  T30-31.[10]

Mr. H. completed a Headache Questionnaire on September 19, 2017, as part of his disability application, and he stated he experienced headaches about twice per month in the past six months, and his last headache lasted six days.  T291.  Mr. H. stated he had not found any medications that provided relief.  Id.

Yet, the record is not unanimous.  In March 2018, Mr. H. was seen at the VA primary care clinic and reported his headaches were stable, intermittent but not debilitating.  T929.  When the State agency medical consultant at the initial level reviewed Mr. H.'s file on November 18, 2017, the consultant concluded Mr. H. had a non-severe impairment of headaches.  T70, 73.  The State agency consultant at the reconsideration level made similar findings on February 20, 2018, but did not indicate whether Mr. H.'s headache impairment was severe or not.  T97-98.  But, at this stage, any doubt about whether Mr. H. met his burden to show his headache condition was severe and medically determinable must be resolved in his favor.  Dewald, 590 F. Supp. 2d at 1199.

The Commissioner correctly notes the ALJ, in its discussion regarding the formulation of Mr. H.'s RFC, did at least note Mr. H.'s subjective complaints

---

[10] The parties agree this VA Rating Decision was not submitted to the ALJ for review, but it was submitted to the Appeals Council.  However, the VA treatment records and VA General Medical – Pension Disability Benefit Evaluation were among the file reviewed by the ALJ.  See T27 (noting Component HO 16F, consisting of Progress Notes from the VA, was part of the record considered by the ALJ).

regarding his headaches.  T16-17.  But in the absence of a clear explanation by the ALJ at step two regarding whether it considered this condition a medically determinable impairment, it is impossible for this court to review the significance of these comments.  On this record, the court cannot say whether it was harmless error for the ALJ to fail to consider whether chronic posttraumatic headaches were medically determinable severe impairments at step two.  It may be that the ALJ determined Mr. H.'s chronic posttraumatic headache condition was not medically determinable, and therefore not part of its analyses at step three and step four.  It is equally likely that the ALJ overlooked or failed to consider one of the conditions Mr. H. alleged was disabling in his application.  There is no clue in the ALJ's opinion as to which circumstance occurred.  This court will not try to read the ALJ's mind or guess.  Instead, remand is warranted so that the ALJ can return to step two of the analysis and determine whether the chronic posttraumatic headache condition is, alone or in combination with other impairments, a medically determinable severe or non-severe impairment and, if so, turn to step three to determine whether Mr. H.'s severe impairments meet or equal a listing and then, at step four, determine Mr. H.'s RFC based on his severe and non-severe impairments. Nicola, 480 F.3d at 887 (reversing where ALJ failed to consider claimant's borderline intellectual functioning at step two); Christi S. v. Berryhill, No. 4:17-CV-04067-KES, 2018 WL 3586277, at *2-3 (D.S.D. July 26, 2018) (remanding for failure to address chronic headache condition at step two).

**2. Whether the Commissioner's Determination of Mr. H.'s RFC Is Supported by Substantial Evidence.**

In order to complete step four, the Commissioner must determine the claimant's RFC, which is the most the claimant can do despite the claimant's mental and physical limitations. Brown v. Barnhart, 390 F.3d 535, 538-39 (8th Cir. 2004) (citing 20 C.F.R. § 404.1545(a)(1)). The ALJ determines a claimant's RFC based on all relevant evidence in the record, including medical records, observations of treating physicians, and the claimant's own description of their limitations. Lacroix v. Barnhart, 465 F.3d 881, 887 (8th Cir. 2006). The ALJ's RFC finding "must be supported by medical evidence that addresses the claimant's ability to function in the workplace." Lewis v. Barnhart, 353 F.3d 642, 646 (8th Cir. 2003) (citation omitted).

Residual functional capacity is "defined as what the claimant can still do despite his or her physical or mental limitations." Lauer v. Apfel, 254 F.3d 700, 703 (8th Cir. 2001) (citations omitted, punctuation altered). "The RFC assessment is an indication of what the claimant can do on a 'regular and continuing basis' given the claimant's disability. 20 C.F.R. § 404.1545(b)." Cooks v. Colvin, No. CIV. 12-4177-KES, 2013 WL 5728547, at *6 (D.S.D. Oct. 22, 2013). The formulation of the RFC has been described as "probably the most important issue" in a Social Security case. McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir. 1982) (en banc), abrogation on other grounds recognized in Higgins v. Apfel, 222 F.3d 504, 505 (8th Cir. 2000).

When determining RFC, the ALJ must consider all of a claimant's mental and physical impairments in combination, including those impairments that

are severe and those that are non-severe. <u>Lauer</u>, 245 F.3d at 703; SSR 96-8p, 1996 WL 374184, at *5. Although the ALJ "bears the primary responsibility for assessing a claimant's residual functional capacity based on *all* relevant evidence . . . a claimant's residual functional capacity is a medical question." <u>Lauer</u>, 245 F.3d at 704 (citations omitted) (emphasis added). Therefore, "[s]ome medical evidence . . . must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace." <u>Id.</u> (citations omitted). Relevant evidence includes: medical history; medical signs and laboratory findings; the effects of treatment, including limitations or restrictions imposed by the mechanics of treatment (e.g., frequency of treatment, duration, disruption to routine, side effects of medication); reports of daily activities; lay evidence; recorded observations; medical source statements; effects of symptoms, including pain, that are reasonably attributable to a medically determinable impairment; evidence from attempts to work; need for a structured living environment; and work evaluations. <u>See</u> SSR 96-8p, 1996 WL 374184, at *5.

"The RFC assessment must always consider and address medical source opinions." <u>Id.</u> at *7. If the ALJ's assessment of RFC conflicts with the opinion of a medical source, the ALJ "must explain why the [medical source] opinion was not adopted." <u>Id.</u>

Ultimate issues such as RFC, "disabled," or "unable to work" are issues reserved to the ALJ. Id. at n.8. Medical source opinions on these ultimate issues must still be considered by the ALJ in making these determinations. Id.

"When there is no allegation of a physical or mental limitation or restriction of a specific functional capacity, and no information in the case record that there is such a limitation or restriction, the adjudicator must consider the individual to have no limitation or restriction with respect to that functional capacity." Id. at *1. However, the ALJ must "make every reasonable effort to ensure that the file contains sufficient evidence to assess RFC." Id. at *5.

When writing its opinion, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence . . . . In assessing RFC, the adjudicator must . . . explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." Id. at *7.

Finally, "to find that a claimant has the [RFC] to perform a certain type of work, the claimant must have the ability to perform the requisite acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." Reed v. Barnhart, 399 F.3d 917, 923 (8th Cir. 2005) (quotation omitted, punctuation altered). RFC is not demonstrated by "the ability merely to lift weight occasionally in a doctor's office." Juszczyk v. Astrue, 542 F.3d 626, 633 (8th Cir. 2008) (quotation omitted). See also SSR 96-8p, 1996 WL 374184, at *1 ("RFC is an assessment of an individual's ability

to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis" for "8 hours a day, for 5 days a week, or an equivalent work schedule.").

### a.    Evaluation of the Treating Specialist's Opinions

Mr. H. asserts the ALJ erred by finding the treating specialist's opinions unpersuasive in evaluating his RFC.  The Commissioner argues the ALJ properly evaluated the treating physician's opinion as inconsistent with the record as a whole.

Because Mr. H.'s social security claim was filed after March 27, 2017, the new rules of 20 C.F.R. § 404.1520c regarding the consideration of medical opinions apply.  See Pemberton v. Saul, 953 F.3d 514, 517 n.2 (8th Cir. 2020). These new rules provide that the Commissioner "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [Mr. H.'s] medical sources."  20 C.F.R. § 404.1520c(a).  Rather, an ALJ is to consider the persuasiveness of any opinion or prior administrative medical finding using the same five factors: (1) supportability of the opinion with relevant objective medical evidence and supporting explanations; (2) consistency with the evidence from other medical sources and nonmedical sources in the claim; (3) relationship with the claimant, including length, purpose, and extent of treatment relationship, whether it is an examining source, and frequency of examination; (4) specialization; and (5) any other factor that tends to support or contradict a medical opinion.  20 C.F.R.

§ 404.1520c(a), (c).  However, § 404.1520c prescribes that the factors of
supportability and consistency are the most important factors.  See 20 C.F.R.
§ 404.1520c(b)(2).  Because of this, the ALJ must "explain how [they]
considered the supportability and consistency factors for a medical source's
medical opinions . . . in [the claimant's] determination or decision."  20 C.F.R.
§ 4041520c(b)(2).  The ALJ may, but is not required to, explain in their decision
how they considered the medical source's relationship with the claimant, the
medical source's specialization, or other relevant factors in evaluating the
medical opinion.  20 C.F.R. § 1520c(b)(2).

The new articulation requirements are meant to "provide individuals with
a better understanding of [the Commissioner's] determinations and decisions"
and "provide sufficient rationale for a reviewing adjudicator or court."
Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 FR
5844-01, at 5854, 5858 (Jan. 18, 2017).  As such, "[i]n most situations, [ALJs]
should also explain how [they] considered the remaining factors to provide the
claimant and subsequent reviewers with a full understanding of [their] analysis
of the evidence."  Articulation Requirements for Medical Opinions and Prior
Administrative Medical Findings – Claims filed on or after March 27, 2017, SSA
POMS DI 24503.030 (Mar. 24, 2017).

Although ALJs are no longer directed to afford controlling weight to
treating source opinions—no matter how well supported and consistent with
the record they may be—the regulations still recognize the "foundational
nature" of the observations of treating sources.  Barrett v. Berryhill, 906 F.3d

340, 343 (5th Cir. 2018).  When treating sources provide opinions, the regulations suggest that they will often be given greater weight because "the examining relationship provides them with a better understanding of an applicant's condition."  Id. (citing 20 C.F.R. § 404.1520c(c)(3)(v) ("A medical source may have a better understanding of your impairment(s) if he or she examines you than if the medical source only reviews evidence in your folder.")).

Regarding Dr. Shaikh's opinion, the ALJ found:

> Adil Shaikh, MD, a Physical Medicine and Rehabilitation specialist, opined that the claimant's chronic back pain limits him to less than a full range of sedentary work, including less than 6 hours sitting, limited reaching and no ability to climb, balance, stoop, kneel, crouch or crawl.  The opinion is not persuasive as it describes a level of physical dysfunction that is inconsistent with the objective medical evidence and without other evidentiary support.  For example, a complete inability to perform postural activities is so extreme and inconsistent with even the claimant's ability to show up for his hearing and attend appointments, that it is wholly unpersuasive.  Similarly, there is no explanation for how reaching increases the claimant's back pain or why he can sit for less than 6 hours.  As a whole, the opinion is just a check the box type form that does not contain explanation or support.

T19.

While the ALJ commented on the persuasiveness of Dr. Shaikh's opinion, the ALJ failed to properly explain why.  "[W]hile an ALJ's explanation need not be exhaustive, boilerplate or blanket statement[s] will not do."  Lucus v. Saul, 960 F.3d 1066, 1069 (8th Cir. 2020) (citation omitted).  See also Phillips v. Saul, No. 1:19-CV-34-BD, 2020 WL 3451519, at *2 (E.D. Ark. June 24, 2020)

(applying <u>Lucus</u> in the context of an ALJ's analysis of a medical source opinion according to § 404.1520c).

In the medical opinion at issue, Dr. Shaikh opined the Mr. H. could: lift and/or carry ten pounds on a frequent or occasional basis; stand and/or walk for at least two hours, cumulative, in an eight-hour workday, sit for a cumulative total of less than six hours in an eight-hour workday, and push and/or pull less than 20 pounds with his arms.  T1041.  Additionally, Dr. Shaikh opined Mr. H. could never climb ramps, stairs, ladders, ropes, or scaffolds, never balance, never stoop, never kneel, never crouch, and never crawl.  T1042.  According to Dr. Shaikh, Mr. H.'s ability to reach his arms was limited, but Dr. Shaikh did not explain the extent of this limitation.  T1043.  Lastly, Dr. Shaikh opined that Mr. H. should avoid even moderate exposure to extreme cold.  T1044.  As objective medical evidence to support his findings, Dr. Shaikh noted only that the movement or environmental conditions discussed could increase Mr. H.'s back pain, and Dr. Shaikh did not provide this rationale for the exertional limitations listed at T1041.  Notably, Dr. Shaikh did not discuss in his opinion Mr. H.'s physical impairments of T12 burst fracture, lumbar degenerative disc disease with L4-5 disc herniation with mild stenosis, and right lateral femoral cutaneous nerve syndrome.

The first factor the ALJ was required to consider in evaluating Dr. Shaikh's opinion was whether it was supported by objective medical evidence and explanations according to § 404.1540c, which requires ALJs to weigh medical source opinions based upon how they present "relevant . . .

objective medical evidence and supporting explanations." 20 C.F.R. § 404.1520c(c)(1). Although the ALJ's decision did not state many reasons why Dr. Shaikh's opinion was unsupported by medical evidence and explanations, it did note Dr. Shaikh gave "no explanation for how reaching increases the claimant's back pain or why he can sit for less than 6 hours." T19. Further, the ALJ found "the opinion is just a check the box type form that does not contain explanation or support." Id.

The parties dispute the ALJ's finding that the opinion was a checkbox form that contains no explanation or support. Mr. H. contends that Dr. Shaikh did explain that his limitations were due to increased back pain associated with movement and cold, and he notes that the checkbox form Dr. Shaikh presented his opinion on was authored and approved by the Commissioner. The Commissioner, on the other hand, reiterates the ALJ's determination that Dr. Shaikh's opinion was a check-the-box type and that the ALJ provided adequate rationale for its determination that the opinion was unsupported by medical evidence or explanation. Specifically, the Commissioner asserts the ALJ met its obligation of explanation as to the supportability of Dr. Shaikh's medical opinions by finding that he provided no objective medical evidence or supporting explanations for why Mr. H.'s back pain increased with reaching his arms or why he could not sit for more than six hours.

The court agrees with the Commissioner on this point. Dr. Shaikh's opinion is conclusory. "A treating physician's assessments 'possess little evidentiary value' when they 'consist of nothing more than vague, conclusory

statements,' such as 'checked boxes, circled answers, and brief fill-in-the-blank responses." Hilliard v. Saul, 964 F.3d 759, 762 (8th Cir. 2020) (quoting Thomas v. Berryhill, 881 F.3d 672, 675 (8th Cir. 2018)).  See also Holmstrom v. Massanari, 270 F.3d 715, 721 (8th Cir. 2001) ("[T]he checklist format, generality, and incompleteness of the assessments limit their evidentiary value.").

As to Mr. H.'s argument that the Commissioner's opinion form is, by its very nature, a checkbox form, it is not the format of the form that makes Dr. Shaikh's opinion conclusory.  See Reed v. Barnhart, 399 F.3d 917, 921 (8th Cir. 2005) (noting the Eighth Circuit has "never upheld a decision to discount [a medical source opinion] on the basis that the 'evaluation by box category' is deficient *ipso facto*); cf. Wildman v. Astrue, 596 F.3d 959, 964 (8th Cir. 2010) (affirming ALJ's discounting a physician's checkbox opinion because it cited no medical evidence and provided little to no support for its conclusions).  Indeed, the SSA form Dr. Shaikh used for his opinion invites the medical source to cite the specific facts upon which their conclusions are based and "explain how and why the evidence supports [their] conclusions."  T1042.  The only "fact" Dr. Shaikh cited was that most back movement and extreme cold can increase Mr. H.'s back pain.  Dr. Shaikh never explained why most back movement— including such diverse motions as pushing and pulling, lifting and carrying, climbing stairs—and extreme cold can increase Mr. H.'s back pain.  Not once did Dr. Shaikh mention Mr. H.'s diagnoses of T12 burst fracture, lumbar degenerative disc disease with L4-5 disc herniation with mild stenosis, and

right lateral femoral cutaneous nerve syndrome in explaining why these postural and environmental conditions can increase back pain.  See Anderson v. Astrue, 696 F.3d 790, 793-94 (8th Cir. 2012) (affirming ALJ's attribution of lesser weight to a physician's opinion in part because "[t]he only explanatory statement on the checkbox form indicates that [the claimant] 'has fibromyalgia which causes a lot of joint pain for her' ").  Dr. Shaikh's limited explanation that certain movements or environmental conditions can cause Mr. H. back pain is even less explanatory than the opinion at issue in Anderson; the physician in Anderson at least noted the cause of the claimant's pain.  See also McCoy v. Saul, No. 4:19-cv-00704-NKL, 2020 WL 3412234, at *4 (W.D. Mo. June 22, 2020) (affirming ALJ's § 404.1520c unfavorable supportability analysis of a checkbox medical source opinion that explained the claimant's limitations as "severe pain due to fibromyalgia").

Yet, even when a checkbox or conclusory medical source opinion does not provide extensive explanations, the ALJ is required to view the medical source opinion in the context of the claimant's medical record.  Despain v. Berryhill, 926 F.3d 1024, 1028 (8th Cir. 2019) (citing Cox v. Barnhart, 345 F.3d 606, 609 (8th Cir. 2003)); see also Phillips, 2020 WL 3451519, at *3 (applying Despain to a medical source opinion evaluated according to § 404.1520c).

Considering Dr. Shaikh submitted only the barest allegation of fact to support his conclusions, the court cannot say that the ALJ erred in determining that the limited explanation to support the substantial limitations

64

contained within the checkbox form supported its determination that the opinion was not persuasive.

The court turns next to whether the ALJ erred in finding that Dr. Shaikh's opinion was inconsistent with other medical sources and nonmedical sources in the claim.  It is unclear from the ALJ's opinion how Dr. Shaikh's opinion was inconsistent with other evidence in the claim. Although the ALJ stated that Dr. Shaikh's opinions were inconsistent with the objective medical evidence, it did not cite any medical sources that are inconsistent with Dr. Shaikh's opinion.  Instead, the ALJ's only specific finding as to consistency was that the limitations described by Dr. Shaikh were inconsistent with Mr. H.'s ability to attend his appointments and his hearing. The ALJ did not specify which appointments it was talking about and did not state what activities by Mr. H. in those appointments were inconsistent with the limitations noted in Dr. Shaikh's opinion.  Nor did the ALJ specify how these items of nonmedical evidence were inconsistent with Dr. Shaikh's opinion.  It could be that the ALJ found that Mr. H.'s apparent ability to leave his house and drive to his medical appointments contradicted Dr. Shaikh's opinions of his limitations.  But the ALJ did not specify its reasoning, and the court will not guess.  The Commissioner again tries to rehabilitate the ALJ's decision with *post hoc* rationalizations for why Dr. Shaikh's opinion was inconsistent with the record.  But, as before, the court will not consider reasoning not included by the ALJ in its decision when reviewing the ALJ's decision for legal error.

" '[A]bsent some explanation for finding an inconsistency where none appears to exist,' [the court] will not fill in the gaps for the ALJ." Lucus, 960 F.3d at 1069 (quoting Reed, 399 F.3d at 921).  Thus, because the ALJ failed to explain why Dr. Shaikh's opinion was inconsistent with the objective medical evidence and nonmedical evidence, the court grant's Mr. H.'s motion to remand as to the ALJ's failure to adequately address the persuasiveness of Dr. Shaikh's opinion according to 20 C.F.R. 404.1520c.

### b.   Whether the ALJ Erred in Formulating Mr. H.'s Physical RFC

Mr. H. argues the ALJ erred in determining his physical RFC, which is quoted in full on pages three and four, above.  First, Mr. H. argues the ALJ erred when it failed to discuss his chronic posttraumatic headache condition at step four.  The court has already ordered remand so that the ALJ can return to step two of the analysis and determine whether Mr. H.'s chronic posttraumatic headache condition is, alone or in combination with other impairments, a medically determinable severe or non-severe impairment and, if so, turn to step three to determine whether Mr. H.'s severe impairments meet or equal a listing and then, at step four, determine Mr. H.'s RFC based on his severe and non-severe impairments.  See supra section D.1.  See Thurston v. Colvin, CIV. 15-5024-JLV, 2016 WL 5400359, at *5 (D.S.D. Sept. 27, 2016) ("[F]ailure to consider plaintiff's limitations . . . infect[s] the ALJ's . . . further analysis under step four.") (quoting Spicer, 64 Fed. App'x at 178).  Accordingly, remand is warranted so that the ALJ can return to step four to determine Mr. H.'s

physical RFC based upon the severe and non-severe impairments it finds at step two.

Next, Mr. H. asserts the ALJ erred by fashioning a sit/stand alternative option in the RFC that is confusing and has no basis in the evidence, and by failing to describe the circumstances for which a cane was required either in the RFC or the hypothetical question asked of the vocational expert.

The RFC determined by the ALJ included the ability to stand or walk for two hours out of each eight-hour workday, and it provided that Mr. H. would need to be able to use a cane.  T16.  The RFC also provided that Mr. H. can sit for six hours out of an eight-hour workday and that "[h]e needs to change position, such that he would need an option to alternate to sitting for less than 5 minutes after every 15 minutes of standing or walking. . . .  He would need an option to alternate to standing for less than 5 minutes after every 30 minutes of sitting."  Id.  The ALJ undergirded this position-changing accommodation, and a limitation on Mr. H.'s standing and walking, with "more recent medical records and the claimant's testimony."  T19.  The ALJ did not state in its decision what new medical records it considered in crafting the sit/stand option or which part or parts of Mr. H.'s hearing testimony informed its decision.

As to the sit/stand alternative, Mr. H. argues the ALJ improperly assumed the role of medical expert and made up the sit/stand alternative with no foundation in the medical evidence.  The Commissioner argues the sit/stand alternative serves to benefit Mr. H. because it allows, but does not

require, him to exercise a position-changing pain relief technique that Mr. H. described as effective at the hearing.  The Commissioner also asserts that, although the ALJ has a duty to fully and fairly develop the record, reversal due to failure to develop the record is warranted only where such failure is prejudicial.  Because the sit/stand option serves to benefit Mr. H., the Commissioner argues, any error was harmless and reversal is not warranted.

First, Mr. H. argues the sit/stand alternative constitutes reversible error because the ALJ did not specify what evidence in the record substantiated it. Although Mr. H. argues the ALJ erred by assuming the role of medical expert and fashioning the sit/stand alternative without support from medical evidence, the ALJ did reference medical reports in this section of the RFC determination; the problem is therefore not that the ALJ assumed the role of medical expert to arrive at the sit/stand alternative, but that the ALJ did not specify which medical records it was referencing.  When deciding the RFC, an ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)."  SSR 96-8p, 1996 WL 374184, at *7.

There is no requirement that an ALJ follow each RFC limitation with a list of specific, supporting evidence.  Bradley v. Colvin, No. 3:14-05052-DGK-SSA, 2015 WL 2365607, at *3 (W.D. Mo. May 18, 2015).  Yet, even if the ALJ does not provide a narrative discussion immediately following each individual limitation in the RFC, the reviewing court must be able to otherwise discern the

elements of the ALJ's decision-making.  Jennings v. Colvin, No. 4:13-cv-00073 JCH, 2014 WL 2968796, at *14 (E.D. Mo. July 1, 2014) (citing Depover v. Barnhart, 349 F.3d 563, 567-68 (8th Cir. 2003)).  See also Lauer, 245 F.3d at 705-06 (8th Cir. 2001) (remand where ALJ's decision unclear as to the medical basis for the RFC assessment); Wilfong v. Berryhill, No. 4:17-cv-2747-SNLJ, 2018 WL 4489453, at *4 (E.D. Mo. Sept. 19, 2018) ("Whether or not Wilfong desires the ALJ to format her opinion to explicitly match each RFC limitation to the supporting evidence, there is nothing contained within SSR 96-8p to require such an undertaking—SSR 96-8p requires only that the evidence, both medical and non-medical, be discussed in a way that would support each conclusion, not that each conclusion must be individually discussed and independently supported.").

In its decision, the ALJ found, "the undersigned has incorporated positional changes and limited the claimant's standing and walking due to more recent medical records and the claimant's testimony.  The additional limitations also account for the fluctuation in the claimant's presentation during his physical examinations."  T19.  The ALJ did not articulate what medical records it was talking about or which part or parts of Mr. H.'s testimony informed its decision.  In the RFC determination, the ALJ engaged in no discussion of the evidence that would support the sit/stand alternative it found in the RFC.  The ALJ did not include in its decision any discussion whatsoever of Mr. H.'s testimony related to managing his pain by alternating between sitting and standing, either in the explanation of the RFC or

69

elsewhere.  The same is true for the more recent medical records the ALJ referenced to support the sit/stand alternative.  Looking at the decision as a whole, it is entirely unclear from the decision what records these might be and what evidence or findings might support a sit/stand alternative.  The ALJ did not discuss the medical and nonmedical evidence in a way that supports the sit/stand alternative.  Indeed, the ALJ did not discuss this evidence related to this finding at all.  Although SSR 96-8p does not require an itemized discussion of each limitation in the RFC and the record support therefor, it does require that the ALJ discuss the medical and non-medical evidence in a way that supports each conclusion.  Therefore, this court cannot say the ALJ satisfied the SSR 96-8p requirement of narrative discussion.

The Commissioner resists Mr. H.'s argument that the ALJ should have supported its RFC finding with specific medical facts and nonmedical evidence on the basis that, although the ALJ has a duty to full and fairly develop the record, reversal due to failure to develop the record is warranted only where that failure was unfair to the claimant or where the claimant was prejudiced. The Commissioner cites Stormo, 377 F.3d 801, 805 (8th Cir. 2004), Haley v. Massanari, 258 F.3d 742, 748 (8th Cir. 2001), and LaCroix v. Barnhart, 465 F.3d 881, 886 (8th Cir. 2006), in support.  To the extent Mr. H. contends the ALJ should have obtained additional information about his need to alternate between sitting and standing to further develop the record, the court agrees with the Commissioner that Mr. H. has not made the requisite showing that he was prejudiced by the sit/stand alternative included in the RFC.  However, as

to the issue of whether the ALJ satisfied the narrative discussion requirements of SSR 96-8p, these cases are inapposite.

First, The Commissioner's reliance on <u>Stormo</u> is misplaced.  In <u>Stormo</u>, the Eighth Circuit affirmed the ALJ's decision not to further develop the record by seeking follow-up treating medical source opinions.  377 F.3d at 806.  The court reaffirmed the principle that an ALJ need not seek additional clarifying statements from a treating physician unless a "crucial issue" is left undeveloped.  <u>Id.</u>  But the <u>Stormo</u> court did not address the issue here, namely whether an ALJ has failed to satisfy the narrative discussion requirement for fashioning the RFC.  Perhaps most importantly, nowhere in <u>Stormo</u> did the Eighth Circuit find that remand for failure to satisfy the narrative discussion requirement for the RFC—or, for that matter, failure to develop the record—is warranted only when the claimant is prejudiced.  Therefore, <u>Stormo</u> is inapposite.

The Commissioner's citation to <u>Haley</u> is similarly unpersuasive.  In <u>Haley</u>, the Eighth Circuit affirmed an ALJ's decision not to send the claimant for a consultive examination where there was substantial evidence in the record to support the ALJ's decision.  258 F.3d at 749.  The Eighth Circuit also noted that reversal for failure to develop the record is warranted only when it is unfair to or prejudices the claimant, and that the claimant had made no showing of unfairness or prejudice.  <u>Id.</u> at 750.  But, as in <u>Stormo</u>, the issue was not whether the ALJ satisfied the narrative discussion requirement for the RFC, but whether the ALJ erred by deciding not to solicit additional medical

71

evidence.  Therefore, the holding from <u>Haley</u> is irrelevant to the issue of whether the ALJ adequately explained the bases for the sit/stand alternative in the RFC decision.

Similarly, the issue in <u>Lacroix</u> was whether the ALJ's decision not to seek additional medical evidence was error.  The Eighth Circuit reiterated the principle that failure to develop the record is error only when it prejudices the claimant.  <u>Lacroix</u>, 465 F.3d at 886.  However, the Eighth Circuit did not address whether remand is warranted when the ALJ fails to discuss evidence in the record in a way that supports a component of their RFC determination. Accordingly, the holding in <u>LaCroix</u> is inapposite to the issue in this case.

Thus, as to Mr. H.'s assignment of error for the ALJ's failure to discuss the medical and nonmedical evidence in such a way that would support the sit/stand alternative, "it is reasonable to require that [the] ALJ's decision be sufficiently articulated." <u>Everson v. Colvin</u>, No. CIV 12-4114, 2013 WL 5175916, at *18 (D.S.D. Sept. 13, 2013) (citing <u>Spicer</u>, 64 Fed. App'x 173) (distinguishing "arguable deficiency in opinion-writing technique" holding from <u>Hepp v. Astrue</u>,511 F.3d 798, 806 (8th Cir. 2008), in a case where the ALJ failed to meet the narrative discussion requirements of SSR 96-8p).  This is because "[r]eviewing courts should not be left to speculate what evidence led the ALJ to his or her conclusions." <u>Everson</u>, 2013 WL 5175916, at *18 (citing <u>Kepler v. Chater</u>, 68 F.3d 387, 391 (10th Cir. 1995)).  This error is not one of arguable deficiency in opinion-writing, but of failure to sufficiently discuss the evidence in such a way to support the limitations found in the RFC.

Accordingly, the ALJ upon remand must discuss the evidence, medical and nonmedical, in a way that supports the sit/stand alternative in the RFC in accordance with SSR 96-8p.

Mr. H. also contends the sit/stand option is inconsistent with the RFC finding as to the total amount of time, out of an eight-hour workday, Mr. H. can sit or stand.  Yet, inconsistency within the RFC does not itself constitute reversible error.  Error must be prejudicial to justify remanding the ALJ's opinion.  Lacroix, 465 F.3d at 886; Samons v. Astrue, 497 F.3d 813, 821-22 (8th Cir. 2007).

Here, Mr. H. has not shown that he was prejudiced by the ALJ's errors in drafting the sit/stand alternative.  While Mr. H. disputes the Commissioner's position that any error by the ALJ on this issue was harmless because the ALJ adopted greater limitations than those suggested by the reviewing doctors, he does not allege any harm flowing from the ALJ's error.  Without a showing of harm, the court must conclude the ALJ's error in calculating the time allotments of the sit/stand alternative was harmless and remand is not warranted.

Next, Mr. H. asserts the ALJ erred in finding that he must be able to use a cane when standing or walking.  First, Mr. H. argues the ALJ erred by failing to include in its decision or the hypothetical questions to the vocational expert any discussion of how and when he would need a cane.  SSR 96-9p, 1996 WL 374185, at *7 (July 2, 1996), provides, "[t]o find that a hand-held assistive device is medically required, there must be medical documentation establishing

the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information)."

Here, Dr. Shaikh prescribed the use of a cane for ambulation on November 1, 2018.  T842.  The VA provided Mr. H. with a cane on November 5, 2018.  T879.  he ALJ found that Mr. H. could stand or walk for two hours out of an eight-hour workday and that he would need the use of a cane.  T16.  The ALJ did not more specifically describe the circumstances where Mr. H. would need the use of a cane.  Yet, SSR 96-9p requires that the medical documentation establishing the need for a hand-held assistive device contain such a description, not that the RFC contains it.  Thus, Mr. H.'s assignment of error for lack of specificity is unpersuasive.

Mr. H. also argues there was error where the VE testified that the jobs he identified Mr. H. could do were seated, light jobs, yet the ALJ found that Mr. H. could sit for only six hours of an eight-hour workday.  Because Mr. H. would need to stand or walk for two hours, Mr. H. argues, the details surrounding when and how he needed to use a cane were directly relevant to whether he could perform these jobs.

SSR 96-9p directs ALJs to consider the particular facts of each case and to apply those facts to determine the occupational impact of the claimant's need to use a hand-held assistive device.  SSR 96-9p, 1996 WL 374185, at *7.  The ruling also admonishes ALJs to consider consulting a vocational resource

to make a judgment regarding the claimant's ability to make occupational adjustments given their hand-held assistive device.  Id.

Here, the ALJ asked the VE if an individual limited in the same ways as described in Mr. H.'s RFC finding, including limited to standing or walking two hours out of the day with the use of a cane, could perform work.  T57-58.  The vocational expert responded that such an individual would be able to perform the three occupations identified by the ALJ in its decision.  Id.  Thus, the ALJ did seek input from the VE as to the effect of Mr. H.'s need to use a cane on his ability to perform work, and the VE opined that Mr. H. would still be able to perform jobs categorized as light and which the vocational expert described as "seated jobs."  T58.  Yet, the ALJ did not describe to the VE any details about how such an individual need to use a cane, e.g., whether they would need it only when walking or whether they would need it even when standing for stability.  Such a difference can have a significant effect on the step-five question of what jobs the individual can perform.  See Williams v. Astrue, No. 4:08-CV-1020 CAS, 2009 WL 2884745, at *7 (E.D. Mo. Sept. 2, 2009) (noting need to use cane for stability, among other postural, physical, and mental limitations, minimized claimant's ability to sustain work activity).

However, Mr. H. has not alleged that his need to use a cane would have any significant effect on his ability to sustain the light work activity the ALJ found at step five.  And, as the Commissioner notes, the need to use a hand-held assistive device does not itself preclude a claimant's ability to perform light work.  See Fleming v. Colvin, No. 14-0136-CV-W-REL-SSA, 2015 WL

753016, at *20 (W.D. Mo. Feb. 23, 2015) (finding claimant able to perform light work despite elective use of two crutches).  Without any assertion from Mr. H. that the ALJ's omission of any descriptive limitations in the RFC about how and when he would need to use a cane changed the outcome, any error on the ALJ's part is harmless and remand on this issue is not warranted.  See Dewey v. Astrue, 509 F.3d 447, 449-50 (8th Cir. 2007) (holding an error is harmless if it would not affect the ALJ's decision).

### c.    Limitations from Mr. H.'s Mental Impairments

Next, Mr. H. asserts the ALJ's formulation of his RFC is not supported by substantial evidence because his mental limitations were not properly incorporated into his RFC.  To this point, Mr. H. asserts the ALJ erred by leaving his mental impairments out of the RFC analysis after identifying non-severe medically determinable mental impairments of anxiety disorder and depressive disorder at step two.  Mr. H. argues his mental impairments—and other mental health conditions not identified at step two—were related to his physical impairments and the chronic pain resulting therefrom.

"RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities."  SSR 96-8p, 1996 WL 374184, at *2.  There is no automatic requirement that an ALJ must discuss every impairment, severe or not, found at step two in the RFC at step four.  Gann v. Colvin, 92 F. Supp. 3d 857, 884

(N.D. Iowa 2015).  However, impairments found at step two or step three, whether severe or not, should be considered by the ALJ when formulating the RFC at step four.  Id.  The key question in whether in impairment found at step two or step three is included in the RFC is whether there is substantial evidence that the impairment actually limits the claimant's ability to work.  Id. at 885 (quoting Taylor v. Astrue, Civil Action No. BPG-11-0032, 2012 WL 294532, at *8 (D. Md. Jan. 31, 2012)).

Here, the ALJ found Mr. H. had medically determinable mental impairments of major depressive disorder and anxiety disorder.  T14.  The ALJ found these impairments, considered singly and together, do not cause more than minimal limitation to Mr. H.'s ability to perform basic mental work activities and therefore found them non-severe.  Id. As for the "paragraph B"[11] criteria, the ALJ found Mr. H. had a mild limitation in understanding, remembering, or applying information, a mild limitation in interacting with others, a mild limitation in concentrating, persisting, or maintaining pace, and a mild limitation in adapting or managing himself.  T14-15.  The ALJ stated that these paragraph B criteria are not part of the RFC assessment but are used to rate the severity of mental impairments at steps two and three.  T15.

---

[11] To satisfy paragraph B criteria, a claimant must have at least one extreme limitation in one of the four categories of work-related functions, or two marked limitations in two categories.  Listings § 12.00(A)2b, (E) – (F).  Mr. K. asserts he had marked limitations in category (3) and (4), interacting with others and managing himself.  A "marked limitation" is defined as "functioning in an area independently, appropriately, effectively, and on a sustained basis is seriously limited."  Id. at (F)2d.  A "moderate limitation" is defined as "functioning in an area independently, appropriately, effectively, and on a sustained basis is fair." Id. at (F)2c.

The ALJ also stated that the RFC analysis at step four required a more detailed assessment involving itemizing specific functions contained within the broad categories of the paragraph B analysis.  Id.

Although the ALJ found non-severe medically determinable mental impairments of anxiety and depression at step two, the ALJ included no mental limitations in the RFC at step four.  The Commissioner asserts that the ALJ did not err by leaving anxiety and depression out of the RFC because the RFC need only address impairments, severe or not, when there are functional limitations stemming from them.  See Hilkemeyer v. Barnhart, 380 F.3d 441, 447 (8th Cir. 2004) (holding ALJs are required to include impairments in the RFC only when there is evidence showing that the impairments cause work limitations).  In the next breath, the Commissioner notes that the ALJ found that Mr. H. *was* limited by these impairments, but that limitation was not more than minimal.  The ALJ found that Mr. H.'s "medically determinable mental impairments of depressive disorder and anxiety disorder, considered singly and in combination, do not cause more that minimal limitation in the claimant's ability to perform basic mental work activities and are therefore nonsevere."  T14.  Thus, contrary to the Commissioner's representations, the ALJ found at step two that Mr. H. was limited, albeit no more than minimally, by his medically determinable mental impairments.

In support of his assertion that the ALJ erred by failing to revisit the mental impairments at step four, Mr. H. cites Perrin v. Berryhill, No. 4:16-CV-04178-LLP, 2017 WL 7050670 (D.S.D. Nov. 27, 2017), adopted by 2018 WL

78

560219 (D.S.D. Jan. 23, 2018).  In <u>Perrin</u>, the ALJ found the claimant's headaches were a non-severe impairment and cited the reasons why he did not believe the headaches "more that 'minimally' limited her ability to work."  <u>Id.</u> at *22.  Because the ALJ accepted the headaches as a medically determinable impairment but did not discuss them in the RFC, the court was left to speculate about what the ALJ considered a "minimal" effect on the claimant's ability to work.  <u>Id.</u>  Because the court in <u>Perrin</u> could not discern from the RFC what effect, if any, the migraines had on the claimant's ability to work, remand was ordered to clarify that issue.  <u>Id.</u> (citing <u>Nicola</u>, 480 F.3d at 887; <u>Parker-Grose v. Astrue</u>, 462 Fed. App'x 16, 18 (2d Cir. 2012) (rejecting commissioner's argument that failure to find mental impairment severe at step two was harmless because "[h]aving found that any functional limitations associated with [claimant's] mental impairment were mild and only minimally affected her capacity to work, the ALJ did not take these restrictions into account when determining her [RFC].").

Here, similar to <u>Perrin</u>, the court is required to speculate what "minimal" or "mild" limitations Mr. H.'s non-severe mental impairments imposed on his ability to work because the ALJ did not discuss these impairments in the RFC. In support of its argument that the ALJ found that the mental impairments of depressive disorder and anxiety disorder required no additional limitations, the commissioner references the ALJ's lengthy discussion of the paragraph B criteria at step two.  But the ALJ expressly disclaimed that its discussion of the paragraph B criteria was part of the RFC and that the RFC would require a

more detailed, itemized assessment of the various functions contained in the broad categories of paragraph B.  T15.  Just like in Perrin, where the ALJ described how the physical impairments caused only minimal limitations, the paragraph B discussion at step two concerns the ALJ's rationale for finding the mental impairments to be non-severe, not a substantive finding of limitations associated with those impairments.

In the alternative, Mr. H. cites Ortman v. Saul, No. 4:19-cv-04049-VLD, 2019 WL 6829207 (D.S.D. Dec. 13, 2019), for the proposition that the ALJ erred by not determining the mental limitations caused by his physical impairments.  In Ortman, the ALJ found no severe or non-severe mental impairments at step two, and the claimant claimed no mental impairments in her application for Social Security and did not testify about any mental impairments at her administrative hearing.  Id. at *17.  Still, the court found that the ALJ erred by failing to undertake any analysis to determine the mental limitations caused by the combination of her severe physical impairments.  Id. This is because SSR 96-8p requires that an RFC assessment include "any related symptoms" resulting from the claimant's medically determinable impairments or combination of impairments.  Id.  The ALJ rejected all medical opinions about the mental limitations caused by the claimant's impairments and instead based the RFC finding on its own interpretation of notations about the claimant's mental examinations in the record.  Id.  The court found that the ALJ should have sought a medical opinion as to any mental limitations

stemming from the claimant's physical impairments and remanded the case for that purpose.  Id. at *18.

Mr. H. asserts the ALJ here similarly failed to account for the mental limitations caused by his medically determinable severe impairments.  However, Ortman is distinguishable.  Unlike in Ortman, the ALJ here found medically determinable non-severe impairments at step two of depressive disorder and anxiety disorder—impairments Mr. H. acknowledges primarily stemmed from his physical impairments.  Further, although it made no finding as to any limitations related to the mental impairments, the ALJ found the State agency psychologist's reconsideration opinion—which included diagnoses of depressive disorder and anxiety disorder—to be supported by the medical evidence and very persuasive.  Here, the ALJ accepted medical opinions that included the mental impairments found at step two; therefore, Ortman is distinguishable.

Although Ortman is distinguishable, remand to clarify the "mild" or "minimal" limitations related to mental impairments found at step two is required.  The court rejects the commissioner's argument that the ALJ's discussion of paragraph B categories at step two can stand in for RFC analysis at step four.  The fact remains that the ALJ included no discussion of what "minimal" or "mild" limitations the non-severe mental impairments imposed on Mr. H.'s ability to work.  Indeed, the RFC mentions the medically determinable impairments of depression and anxiety only in describing the diagnoses made by the State agency psychologist on reconsideration.  T19.  Although the ALJ

81

found this opinion to be "very persuasive" (id.), it did not discuss these diagnoses or any resulting limitations.  As in Perrin, the court is left to speculate why this is so.  This case must be remanded for clarification of this issue.  Without clarification, the court cannot review whether the ALJ's decision is supported by substantial evidence.

### 3. Whether the Commissioner Erred by Failing To Consider New and Material Evidence Submitted to the Appeals Council

Next, Mr. H. asserts the Commissioner erred by failing to consider new and material evidence submitted to the Appeals Council.  The evidence Mr. H. claims the Appeals Council failed to consider is a VA Rating Decision dated February 2, 2018, wherein the VA decided to award Mr. H. a non-service-related disability pension on the basis that he was "unable to maintain substantially gainful employment."  T30.

The Commissioner resists Mr. H.'s assignment of error first on the basis that this court does not have jurisdiction to review the Appeals Council's decision not to review the ALJ's findings.  This Court's jurisdiction extends only to a review of the agency's final decision.  42 U.S.C. § 405(g).  When the Appeals Council declined review, the ALJ's decision became the Commissioner's final decision.  See Sims v. Apfel, 530 U.S. 103, 107 (2000).  Therefore, the Commissioner argues, this court lacks jurisdiction to review the Appeals Council's decision.  See Docket No. 19 at p. 32 (citing Kitts v. Apfel, 204 F.3d 785, 786 (8th Cir. 2000) ("When the Appeals Council has considered new and material evidence and declined review, we must decide whether the ALJ's decision is supported by substantial evidence in the whole record,

including the new evidence."). The court rejects the Commissioner's jurisdiction argument. Here, unlike in <u>Kitts</u>, it is not the case that the Appeals Council considered new evidence and declined review.

In <u>Mackey v. Shalala</u>, 47 F.3d 951, 953 (8th Cir. 1995), the Eighth Circuit determined that a court may not review an Appeals Council's decision to deny review because it is not a final agency action. While the Commissioner is correct to note that this court lacks jurisdiction to review an Appeals Council's decision to deny review, Mr. H. has not made such a request in this case. That is, Mr. H. is not challenging the Appeals Council's decision not to review the ALJ's decision. Rather, Mr. H. is challenging the Appeals Council's apparent failure to consider the additional evidence he submitted. In other words, he is challenging the Appeals Council's alleged legal error in failing to consider the VA Rating Decision, not the substance of the Appeals Council's decision. <u>See, e.g.</u>, <u>Keeton v. Dep't of Health & Human Servs.</u>, 21 F.3d 1064, 1066 (11th Cir. 1994) ("When the Appeals Council refuses to consider new evidence submitted to it and denies review, that decision is also subject to judicial review because it amounts to an error of law."). Accordingly, this court has jurisdiction to review the Appeals Council's decision for the limited purpose of reviewing whether the Appeals Council committed legal error by allegedly failing to consider the VA Rating Decision

The Appeals Council will review a case if it receives additional evidence the claimant shows is new, material, and relates to the period on or before the date of the ALJ's decision. The claimant must also show a reasonable

probability that the additional evidence would change the outcome of the ALJ's decision.  The claimant must show good cause for why they did not present this evidence before the ALJ.  See 20 C.F.R. § 404.970(a)(5) & (b) (amended Dec. 16, 2016); 20 C.F.R. 416.1470(a)(5) & (b).

The Appeals Council is required to evaluate all evidence it receives. However, the Appeals Council is not required to mark as an exhibit and make part of the official record evidence that does not meet the requirements stated in the preceding paragraph.  See Hearings, Appeals and Litigation Law (HALLEX) manual I-3-5-20, Evaluation of Add'l Evid., 1993 WL 643143, at *1. According to agency requirements, if the Appeals Council analyst recommends that the Appeals Council deny review, the analyst must prepare a denial notice that explains in the analysis if the evidence is not material, does not relate to the period at issue, does not show a reasonable probability of changing the outcome of the ALJ's decision, or why the claimant has not shown good cause for not presenting this evidence earlier.  Id. at *2.  The analyst is also required to "[i]nclude language in the denial notice specifically identifying the additional evidence (by source, date range, and number of pages) and the reason why the evidence does not provide a basis for granting review."  Id.  The HALLEX provides sample language for the analyst to use, e.g., "We find this evidence does not show a reasonable probability that it would change the outcome of the decision.  We did not exhibit this evidence."  Id. at *2-3.  This requirement is not dependent upon whether the evidence is made an exhibit to the Appeals Council's decision.

Here, Mr. H. submitted a VA Rating Decision dated February 2, 2018, to the Appeals Council on December 3, 2019. T28-31. The Appeals Council denied Mr. H.'s request for review on April 23, 2020. T1-5. The Appeals Council's denial notice does not mention at all the VA Rating Decision and did not include it as an exhibit to its decision and make it part of the administrative record. T4. The denial notice contains no explanation whatsoever of its analysis of the VA Rating Decision. However, the VA Rating Decision was included in the case record for court review.

The Commissioner argues the fact that the VA Rating Decision was included in the record for court review is evidence that that the Appeals Council evaluated it and denied review because the evidence did not meet the criteria of § 404.970(a)(5) & (b). Mr. H. argues the Commissioner's interpretation is *post hoc* speculation. The court agrees with Mr. H. The inclusion of the Rating Decision in the record is evidence of nothing as regards the Appeals Council's evaluation of that additional evidence. While the Commissioner asserts the presence of the Rating Decision in the record is for purposes of court review, court review of the Appeals Council's decision to reject the additional evidence in this case is impossible. Without an analysis of the additional evidence by the Appeals Council and an explanation of that analysis in the denial notice, there is nothing for the court to review. In other words, the court simply cannot review the decision to reject the additional evidence because the denial notice does not explain how that decision was made. The court would be left to speculate, as does the Commissioner in its

motion to affirm, on what basis the Appeals Council rejected the VA Rating Decision.  This the court will not do.

Accordingly, remand is required for clarification of how the Appeals Council evaluated the VA Rating Decision and its analysis thereof.  An explanation of the Appeals Council's analysis should be contained on the notice denial as required by agency regulations.

### 4.    Whether the Commissioner Carried His Burden at Step 5 To Identify Jobs Mr. H. Could Perform Based on Substantial Evidence

Mr. H. alleges the ALJ erred at step five in determining the number of jobs available in the national economy.  The VE testified Mr. H. could do the jobs of electronics worker, circuit board assembler, and wafer cleaner.  T57-58. The VE testified there were 48,000 44,000, and 51,000 of each of these jobs, respectively, which were available "nationally."  Id.

Section 423(d) of Title 42 provides in pertinent part as follows:

(d) "Disability" defined

(1) The term "disability" means—

(A) Inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months

\*        \*        \*

(2) For purposes of paragraph (1)(A)—

(A) An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work

> experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. *For purposes of the preceding sentence* (with respect to any individual), *"work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.*

See 42 U.S.C. § 423(d)(1)(A) and (2)(A) (emphasis added).  See also 20 C.F.R. § 404.1566(a) ("We consider that work exists in the national economy when it exists in significant numbers either in the region where you live or in several other regions of the country.").

The Commissioner's rulings state "[w]henever vocational resources are used and the decision is adverse to the claimant, the determination or decision will include: . . . a statement of the incidence of such work in the region in which the individual resides or in several regions of the country." See SSR 85-15, 1985 WL 56857, at *3 (1985).  The purpose of these provisions is so that claimants are not denied benefits on the basis of "[i]solated jobs that exist only in very limited numbers in relatively few locations outside of the region where [they] live." 20 C.F.R. § 404.1566(b).  This court, in Porter v. Berryhill, 5:17-CV-05028-VLD, 2018 WL 2138661, at *63 (D.S.D. May 9, 2018), found that "at step five, the ALJ must find that jobs the claimant can do exist in substantial numbers in the claimant's own 'region' (something less than the whole nation), or in "several regions" (several parts that, together, consist of something less than the whole nation)." Id. (ordering remand because VE testified only about

jobs available "nationally" and ALJ only considered jobs available nationally at step five).

Here, the VE testified only to the number of jobs available "nationally." T58. "[Section] 423(d)(2)(A) and § 404.1566 require more specificity than that." Porter, 2018 WL 2138661, at *64. The burden to find these qualifying jobs is on the Commissioner at step five of the sequential analysis. Herron v. Shalala, 46 F.3d 45, 47 (8th Cir. 1995). The law clearly requires the Commissioner to present evidence that a substantial number of jobs exists in Mr. H.'s region or in several regions of the country. Therefore, the absence of valid evidence of substantial numbers of jobs in Mr. H.'s region or several other regions is an absence of evidence that cuts against the Commissioner. This court will not hazard guesses about facts that might have been adduced at the agency level, namely whether the jobs the VE identified exist in substantial numbers in the region where Mr. H. lives or in several other regions of the country. The Commissioner's failure of proof requires remand to the agency to further develop these facts at step five.

The Commissioner resists this outcome on several grounds. First, the Commissioner cites Weiler v. Apfel, 179 F.3d 1107, 1111 (8th Cir. 1999), for the proposition that the Commissioner satisfied its burden to show there are a significant number of jobs in the national economy which Mr. H. could perform because the VE testified to a total of 143,000[12] jobs nationally because that

---

[12] The Commissioner mistakenly states the VE testified to 140,000 jobs. Docket No. 19 at p. 32.

number is greater than the 32,000 jobs nationally found in <u>Weiler</u>.  In <u>Weiler</u>, the claimant appealed the ALJ's unfavorable decision on the basis that the ALJ erroneously concluded that there were a significant number of jobs in the economy the claimant could perform.  179 F.3d at 1110.  Specifically, the claimant asserted the jobs the VE testified to were actually incompatible with his RFC.  <u>Id.</u>  The Eighth Circuit rejected this argument and, without going into the details of the other three jobs the VE testified about, noted the VE testified that there were 32,000 surveillance monitor jobs in the national economy.  <u>Id.</u> at 1111.  The other three jobs were deliverer, locker room attendant, and arcade attendant.  <u>Id.</u> at 1109.

Contrary to the Commissioner's representation, the Eighth Circuit did not find the 32,000 surveillance monitor jobs to be a significant number of jobs in the economy which the claimant could perform.  Instead, in holding that the jobs the VE testified to were compatible with the claimant's RFC, the court found that the VE's testimony—which also included testimony about the number of deliverer, locker room attendant, and arcade attendant jobs (<u>id.</u> at 1109)—was substantial evidence of a significant number of jobs in the economy the claimant could perform.  <u>Id.</u> at 1111.  Thus, not only is the sentence from <u>Weiler</u> quoted by the Commissioner mere dicta, but also the factual representation the Commissioner made is untrue.  Accordingly, the holding in <u>Weiler</u> is irrelevant to the issue of whether the Commissioner failed to meet its burden at step five in this case.

Second, the Commissioner asserts that the proper focus of the Social Security Act is the presence of jobs in the national economy, not regional economies.  See Docket No. 19 at p. 33 (citing Raymond v. Astrue, 621 F.3d 1269, 1274 (10th Cir. 2009); Allen v. Bowen, 816 F.2d 600, 603 (11th Cir. 1987).  The court agrees that the proper focus of the Act is the national economy; that is why § 423(d)(2)(A) and § 404.1566(a) permit the Commissioner to identify jobs in several regions of the country other than the region where the claimant lives.  This does not mean, however, that the Commissioner may shrug its burden to show the existence of jobs in the national economy *as that term is defined by law*.  The law does not require the Commissioner to "show that jobs exist within a reasonable distance from [a] claimant's home and that [a] claimant would be employed if he applied for such jobs."  Miller v. Finch, 430 F.2d 321, 324 (8th Cir. 1970).  But the law does require the Commissioner to show that there are a substantial number of jobs in the national economy, meaning jobs that are in the region where the claimant lives or several other regions of the country.  The Commissioner's argument that it does not is tantamount to asking the court to authorize its knowing deviation from the law.  The court rejects this request.

Third, the Commissioner asserts Mr. H. has forfeited any objection to the VE's testimony because he did not object to the VE's testimony at the hearing. The Commissioner's citations to Anderson v. Barnhart, 344 F.3d 809, 814 (8th Cir. 2003), and Shaibi v. Berryhill, 883 F.3d 1102, 1109-10 (9th Cir. 2017), are unpersuasive.  In Anderson, the claimant appealed the ALJ's

decision, asserting error because the ALJ did not consider his morbid obesity as an impairment.  <u>Anderson</u>, 344 F.3d at 814.  Although the ALJ noted the claimant's obesity in its decision, the claimant never alleged any functional limitations caused by obesity in his application for benefits or at the ALJ hearing.  <u>Id.</u>  Accordingly, the Eighth Circuit found the claimant had waived his ability to raise this issue on appeal.  <u>Id.</u>  Here, Mr. H. has not asserted that the ALJ erred by failing to consider an impairment he never complained of; he is asserting the Commissioner failed to meet its burden at step five.  <u>Anderson</u> does not bar the court's review of this assignment of error regardless of whether Mr. H.'s attorney failed to object at the hearing.

Nor does <u>Shaibi</u>, which is not binding on this court, require the finding that Mr. H. forfeited this claim by not objecting at the hearing.  In <u>Shaibi</u>, the Ninth Circuit held that a claimant forfeits a challenge on appeal to the evidentiary basis of a vocational expert's jobs numbers if the claimant does not challenge the evidentiary basis during administrative proceedings before the agency.  <u>Shaibi</u>, 883 F.3d at 1109.  Here, Mr. H.'s claim of error has nothing to do with the evidentiary basis of the VE's jobs numbers, and it does not challenge any evidence adduced at the agency level.  Instead, Mr. H. is asserting legal error at step five because the Commissioner failed to meet its burden.  This is not the type of evidentiary claim at issue in <u>Shaibi</u>, and Mr. H. did not forfeit this claim of legal error because his attorney did not object to evidence adduced at the hearing.

Therefore, remand to the agency is required to further develop facts about the existence of qualifying jobs in the national economy as that term is defined by law.

**E.    Type of Remand**

For the reasons discussed above, the Commissioner's denial of benefits is not supported by substantial evidence in the record.  Mr. H. requests reversal of the Commissioner's decision with remand and instructions for an award of benefits, or in the alternative reversal with remand and instructions to reconsider his case.

Section 405(g) of Title 42 of the United States Code governs judicial review of final decisions made by the Commissioner of the Social Security Administration.  It authorizes two types of remand orders: (1) sentence four remands and (2) sentence six remands.  A sentence four remand authorizes the court to enter a judgment "affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).

A sentence four remand is proper when the district court makes a substantive ruling regarding the correctness of the Commissioner's decision and remands the case in accordance with such ruling.  Buckner v. Apfel, 213 F.3d 1006, 1010 (8th Cir. 2000).  A sentence six remand is authorized in only two situations: (1) where the Commissioner requests remand before answering the Complaint; and (2) where new and material evidence is presented that for

good cause was not presented during the administrative proceedings.  Id. Neither sentence six situation applies here.

A sentence four remand is applicable in this case.  Remand with instructions to award benefits is appropriate "only if the record overwhelmingly supports such a finding."  Buckner, 213 F.3d at 1011.  In the face of a finding of an improper denial of benefits, but the absence of overwhelming evidence to support a disability finding by the Court, out of proper deference to the ALJ the proper course is to remand for further administrative findings.  Id.; Cox v. Apfel, 160 F.3d 1203, 1210 (8th Cir. 1998).

In this case, reversal and remand is warranted not because the evidence is overwhelming, but because the record evidence should be clarified and properly evaluated.  See also Taylor v. Barnhart, 425 F.3d 345, 356 (7th Cir. 2005) (an award of benefits by the court is appropriate only if all factual issues have been resolved and the record supports a finding of disability).  Therefore, a remand for further administrative proceedings is appropriate.

## CONCLUSION

Based on the foregoing law, administrative record, and analysis, it is hereby ORDERED that the Commissioner's decision is REVERSED and REMANDED for reconsideration pursuant to 42 U.S.C. § 405(g), sentence four.

Mr. H.'s motion to remand [Docket No. 16] is GRANTED and the

Commissioner's motion to affirm [Docket No. 18] is DENIED.

DATED March 30, 2021.

BY THE COURT:

VERONICA L. DUFFY
United States Magistrate Judge